UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
)
V. ) CR-04-30034-MAP
)
)
MICHAEL CROOKER )

SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
AND PROPOSED FINDINGS OF FACT

PROPOSED FINDINGS OF FACT

(SEE ATTACHED)

POSSESSORY VERSUS PRIVACY INTERESTS

Possessory interests are affected by seizures; privacy interests by searches. Both are implicated in this case. Defendant Crooker has standing because it was his Insured Parcel Post package being sent. In the event that the court was to find no privacy interest implicated due to the "not sealed against inspection" postal rule, Crooker still has a viable possessory interest claim as to the initial parcel seizure, the duration of its detention, and the subsequent seizure of the air rifle "silencer" under the Plain View Doctrine. (Also, even if a search warrant is not needed to inspect an Insured Parcel Post package, the postal rules still require a search warrant to seize the parcel or contents.)

POSSESSORY INTERESTS

Crooker had a possessory interest in the Insured Parcel Post package for as long as it took to see it safely in the hands of Mr. Paulus in Ohio. This possessory interest was implicated and infringed by both the initial seizure

-2-

of the parcel as well as the lengthy week-long-plus warrantless detention that
followed.

## THE PARCEL SEIZURE AND DETENTION

Here we deal with a questionable investigative seizure of a mailed parcel,
followed by a lengthy 7 1/2-day warrantless detention, the a warrant search,
and a Plain View seizure.

In United States v. Van Leeuwen, 397 U.S. 249, 90 S.Ct. 1029 (1970) the
Supreme Court held that a mailed parcel could be briefly detained up to 29-hours
while law enforcement authorities obtained a search warrant:

> The rule of our decision certainly is not that First-Class
> mail can be detained 29-hours after mailing in order to
> obtain the search warrant needed for its inspection.  We only
> hold that on the facts of this case—the nature of the
> mailings, their suspicious character, the fact that there
> were two packages going to separate destinations, the
> unavoidable delay in contacting the more distant of the
> two destinations, the distance between Mt. Vernon and
> Seattle—a 29-hour delay between the mailings and the
> service of the warrant cannot be said to be 'unreasonable'
> within the meaning of the Fourth Amendment.

397 U.S. at 253.

The leading case on parcel detentions in the First Circuit is United States v.
LaFrance, 879 F.2d 1 (1989) where a 135-minute detention beyond a guaranteed
delivery deadline was upheld due to the facts of that particular case.  While the
issue of reasonable suspicion to detain the parcel was not at issue in LaFrance
as it is here, the First Circuit did squarely deal with the duration of detention.
"We must ask whether the detention, taken as a whole, or any step therein was
unreasonable."  879 F.2d at 6.  Two chief factors were identified and a third
was held to be not relevant to parcel seizures.  The two are (1)  investigatory
diligence (or lack thereof) and (2) duration of detention, each of which "has a

-3-

theoretical outer limit which alone might render detention unconstitutional."
879 F.2d at 7.  Diligence was defined as "steady, ernest, energetic and attentive
application and effort toward a predetermined end."  879 F.2d at 8.  While no
court has ever upheld a 7 1/2-day warrantless parcel detention such as occurred
here, the Ninth Circuit in United States v. Dass, 849 F.2d 414, 415 (1988)
specifically held that 7-days was unreasonable:

> The delays could have been much shorter (36 hours) if
> the police had acted diligently.  The government,
> in effect, asks us to hold that law enforcement
> officials may obtain search warrants for mailed
> packages at their leisure.

(It is worth noting that Dass involved the separate applications for over 400
search warrants versus the single search warrant here.)

## REASONABLE SUSPICION FOR THE INITIAL PARCEL SEIZURE

Reasonable suspicion for the initial parcel seizure was lacking.  There are a
number of reasons why it was not reasonable to suspect that this parcel mailed
June 7, 2004 contained nonmailable hazardous materials.

(1)  The initial information from the Wisconsin eBay competitor was some
6-weeks old and Crooker had been kicked off eBay and his eBay seller account
closed some 5-weeks earlier.

(2)  Inspector Dailey never verified whether the email address belonged to
Crooker, whether the eBay user name was Crooker's, he did not contact the
eBay complainant to verify his allegations and did not contact eBay itself to see
if the chemical sales were still ongoing or if the eBay account was even still
active.

-4-

(3)  Inspector Dailey did not check with the addressee of the parcel to
inquire if he was expecting or had purchased anything hazardous and nonmailable
from Crooker.

(4)  It wasn't even clear from the conflicting and confused regulations
whether the two acids in small quantities sold or offered for sale 6 or more
weeks earlier were nonmailable.

(5)  The nearly 18-pound parcel insured for $400.00 was not at all consistent
with the offerings 6-weeks earlier on eBay of small, inexpensive chemical amounts
of $10.00 and 1/4 and 1/2 pounds.

It appears that Inspector Dailey (who knew Crooker's name as having a
criminal record and as a suer of law enforcement) made an unwarranted rush to
judgment and that as soon as he heard the third-hand Wisconsin allegations on
June 1, 2004, it was off to the post office with no verification of anything
to seize whatever package Crooker came in to mail next, regardless of weight,
size, shape, destination or value.  (According to his testimony, he instituted a
"Parcel Watch" and that means any parcel is seized.)

When Crooker mailed the parcel he truthfully reported that it contained
metal parts (or an air rifle, pump, and accessories).  Dailey's testimony that
he wanted to do an X-Ray to determine if Crooker was mailing "a large metal
container of chemicals" lacks credibility for an X-Ray cannot "see" nonmetallic
chemicals and even if it could, it could not determine whether they would be
mailable or nonmailable.  (The list on eBay had more mailable ones on it than
it did nonmailable ones.)  A more likely explanation is that Dailey wanted to see
if Crooker was telling the truth about mailing metal parts and out of idle
curiosity he wanted to know what those metal parts went to.

-5-

The failure to verify anything indicates a glaring lack of diligence which caused the mistaken seizure of the parcel for the alleged mailing of hazardous chemicals.  Any reasonably diligent law enforcement official faced with allegations of illegal mailings in April, 2004 being reviewed in June, 2004 would check with eBay to (A) determine if such sales are still ongoing, and (B) if they are, determine what currently is being sold and its mailability or nonmailability. Had he done so and discovered the closed eBay account we would likely not be here today litigating this.

## REASONABLENESS OF THE DURATION OF DETENTION

Following the initial seizure on June 7, 2004, Inspector Dailey's lack of diligence continued for over a week while the parcel was withheld from the mailstream awaiting Dailey's procurement of a search warrant.

For the first three days, June 7, June 8, and June 9, 2004, all he did was make some inquiries of attorneys and about a dog-sniff.  In this time period he logged 3-hours as to the parcel but 21-hours as to other matters such as his cruiser-radio and exercise at Planet Fitness.

On the fourth day, June 10, 2004, when he did the X-Ray search, it was about the time the parcel would have been delieverd in Ohio.  On the fifth day and the seventh days he did nothing at all in order to observe President Reagan's death and Sunday.  And on the sixth day he spent only 2-hours, working on a search warrant application.  Finally on the eighth day, after 7 1/2-days of detention, he applied for and procured the search warrant.

The above is about as far from diligent as one can get.  It certainly does not rise to the level of "steady, ernest, energetic and attentive application and effort."  Search warrants should be resolved in hours--here we are getting into days and weeks.  Elicited from the witness stand in this case was the fact that

-6-

federal agents can obtain search warrants even at night, on weekends, and holidays.

As was held in the Dass case, supra, even when 400 search warrants need to be obtained for mailed packages, they can be had in 36-hours.  Seven and a half days is unreasonable several times over for a single search warrant.

While this case is distinguishable from LaFrance as, among several other things, there was not a set delivery deadline, even if the 4-day figure is used (time of delivery for Parcel Post from Feeding Hills, MA to Celina, OH per the USPS Website) and the claim is made that Crooker wasn't dispossessed of his parcel for 4-days, the detention here went on so long that it became half-a-week beyond when the parcel would have been delivered in Ohio.  (And Crooker does not even agree with this analysis since previously in his business he sent Parcel Post packages to Ohio in 3-days and it is theoretically possible for them to make it in 2-days).

The detention in this case of 7 1/2-days surely approached and passed the "margins of the theoretical limit of reasonableness envisioned in Van Leeuwen." LaFrance, supra, 879 F.2d at 10.

## PRIVACY INTEREST

Crooker claims a privacy interest in the insured parcel and states that no vague postal rule about paying higher postage to "seal against inspection" can suprecede the Fourth Amendment's proscription against unreasonable searches. There has been no explicit consent to search and there has been no notice to postal customers.  An implied consent to search cannot reasonably be inferred from vague postal rules that are not conspicuously posted and which ordinary folks do not know about.  Members of society would reasonably expect that sealed packages which they mail Insured Parcel Post will not be opened, tampered with, or seized without a court order.

-7-

But even if this were not the case, once a search warrant did issue (and one is required by postal rules for underlineseizures), the package opening and search has to be governed by the rules of search warrants and the supervision of the courts who issued them. This includes the rules related to the Plain View Doctrine and its "immediately apparant" criteria for items not specifically listed in the search warrant.

## EXECUTION OF THE PARCEL SEARCH WARRANT
## AND THE PLAIN VIEW DOCTRINE

After a 7 1/2-day warrantless parcel detention, the package was finally opened up pursuant to a search warrant at 5:05 P.M. on June 14, 2004. The "a firearm" listed on the face of the search warrant which was the only thing authorized to be seized and which Inspector Dailey admits was a reference to the X-Ray depiction attached to the search warrant application, turned out to be a nonregulated air rifle.

The search continued however and a cylindrical object was found. The threaded end of this object mated to the threaded end of the air rifle's muzzle and it was screwed on and a photograph taken. (Government Exhibit 17). Inspector Dailey and Agent Burns both testified that it could not be determined without testing whether the cylindrical device, an obvious "silencer" for an air rifle, might also be able to work on a real firearm. Despite their uncertainty, they seized the device anyway along with the entire package and its contents.

Because it was not "immediately apparant" that the cylindrical device of the air rifle was incriminating, it should not have been seized. While a "firearm-silencer" (but underlinenot an air gun or paintball gun silencer) is considered under the law to be a "firearm," the "a firearm" listed in the search warrant as subject to seizure referred to the X-Ray depiction of the weapon resembling a shotgun that

-8-

turned out to be an air rifle.  It didn't refer to any cylindrical devices that
could not be seen on the X-Ray.  Not only that, but no one even knew at the time
whether or not the air gun device could also work as a firearm-silencer thus making
it a "firearm" in itself.  So this cylindrical device was not covered by the search
warrant and its seizure does not satisy the "immediately apparant" test of the
Plain View Doctrine.

## THE SUBSEQUENT SEARCHES OF THE VEHICLE AND RESIDENCE

Besides being poisoned fruit of the 7 1/2-day warrantless parcel detention,
the vehicle "inventory search" was a sham and the residence search was spoiled by
the night-time searching prohibited by the search warrant and the seizure of
hundreds of items outside the scope of the warrant.

As to the vehicle, no written inventory has ever been provided to the
defendant or to the court.  This search began in the vehicle's trunk within seconds
of the arrest, taking place while agents armed with military battle rifles had
caused such a spectacle that traffic on busy Springfield Street was stopped in
both directions.  True inventory searches are done at police stations and impound
yards, not in the middle of the street.  And a true inventory search will result
in a written inventory.

With respect to the residence, a night-time search was prohibited by the face
of the search warrant.  No one was authorized to be searching between the hours
of 10 P.M. and 6 A.M. yet Agent Burns testified that they were searching until
"well after midnight."  No court authorization was sought.

As to the dozens and dozens of seizures of items outside the scope of the
warrant, the justification given is that an explosive can be considered a "firearm"
under 18 U.S.C.§921 and items might have "residue" on them from the manufacture

-9-

of explosives. This explanation is being invented as a defense in this Suppression Hearing. Such an excuse, if accepted by the court, would cover each and every single item in the entire residence which would relegate the search warrant to be a general warrant where anything at all could be seized.

An otherwise valid search of a residence can turn into one which violates the Fourth Amendment. <u>Wilson</u> v. <u>Arkansas</u>, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed. 2d 976 (1995)(Knock and Announce Rule). The unauthorized night-time searching in this case alone renders this search bad. Add to that the unauthorized seizure of hundreds of items not related to the Interstate Transportation of a Firearm-Silencer and it becomes doubly bad. Plus it was poisoned fruit making it bad three times over,

## CONCLUSION

There was not reasonable suspicion to detain the parcel. There was a lack of diligence on the part of Inspector Dailey who did not verify anything. Even if there was reasonable suspicion to detain the parcel, the subsequent 7 1/2-day warrantless detention was so unreasonable as to violate the Fourth Amendment. Further lack of diligence was exhibited during this period including entire days when nothing at all was done and other days where a mere 1-hour was spend dealing with the detention. The seizure of the cylindrical air gun device during the warrant search was outside the scope of the search warrant and it was not "immediately apparant" that the device was unlawful. The "inventory search" of the vehicle and the residence search are poisoned fruits. Also the inventory search was a sham. The residence search was an illegal night-time search prohibited by the warrant and was further spoiled by the hundreds of items seized outside the

-10-

scope of the warrant.

Respectfully submitted,

*Michael Alan Crooker*

Michael Alan Crooker, pro se
Essex County Correctional Facility
20 Manning Ave.
Middleton, MA  01949

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I have this date served a copy of the foregoing upon Kevin O'Regan, Asst. U.S. Attorney, 1550 Main Street, Springfield, MA  01103 and Vincent Bongiorni, Esq., 95 State Street, Suite 309, Springfield, MA 01103.

Dated: 10/17/2005                    s/ *Michael Alan Crooker*

-11-

## PROPOSED FINDINGS OF FACT

1) On April 21, 2004 an eBay user and competitor in the chemical resale business, one Will Costa, complained to the Milwaukee U.S. Postal Inspectors (USPIS) that another eBay seller had admitted to mailing nitric acid and planned to mail hydrochloric acid. The Postal Regulations are confused as to whether these chemicals in small quantities are "hazardous materials." (Government Exhibits 5 and 6; Testimony of Harold Stevens; Testimony of Bryon Dailey)

2) Costa identified this person as the defendant Crooker with an email address of mgmike2424@comcast.net and an eBay user name of mgmiuke. He sent the Milwaukee USPIS a list of chemicals and other items that mgmiuke was currently selling. He also sent the defendant's address from the U.S. White Pages and the address of the Feeding Hills Post Office. (Government Exhibits 5 and 6)

3) Milwaukee USPIS emailed the above complaint to the Springfield, MA USPIS. (Testimony of Bryon Dailey)

4) During the last week of April, 2004 the defendant Crooker's eBay seller account was suspended  due to a delinquency in payment of $1,300 in seller fees and it has been suspended ever since. (Testimony/Affidavit of Michael Crooker)

5) Springfield, MA USPIS Inspector Dailey got around to viewing the April 21, 2004 complaint on June 1, 2004. (Testimony of Bryon Dailey)

6) Dailey was aware of a Michael Crooker who had a criminal record and who had sued law enforcement. (Testimony of Bryon Dailey)

7) Dailey never verified that the email address actually was connected to defendant Crooker. (Testimony of Bryon Dailey)

8) Dailey never verified that the eBay user name of mgmiuke was connected to defendant Crooker. (Testimony of Bryon Dailey)

9) Dailey did not verify any information with or even contact Costa until the next year. (Testimony of Bryon Dailey)

10) Both Government Exhibits 5 and 6 state thereon: "The Wisconsin customer provided the MA address. This address has not been confirmed to be the address of the eBay seller in question." (Government Exhibits 5 and 6)

11) Dailey never discovered that Crooker's eBay account had been closed in April, 2004. He did not contact eBay at all. (Testimony of Bryon Dailey)

12) Dailey interviewed the employees of the Feeding Hills Post Office and learned that the defendant Crooker had been a frequent parcel mailer. (Testimony of Bryon Dailey)

-12-

13) Dailey ordered a "Parcel Watch" which means that any parcels mailed by Crooker would be held aside, not inputted into the Postal Service, and Dailey be notified. (Testimony of Bryon Dailey)

14) Crooker mailed a parcel about Noon on June 7, 2004 that weiged 17 pounds, 9 ounces and he insured it for $400. It was addressed to Mike Paulus, 1145 Shimp Dr., Celina, OH 45822. Had it not been for the Parcel Watch, the parcel would have moved to the Springfield Bulk Mail Facility by day's end. (Testimony of Bryon Dailey; Testimony of Harold Stevens; Testimony/Affidavit of Michael Crooker)

15) The USPS Website's Postage Calculator states that the delivery time for Parcel Post between Feeding Hills, MA and Celina, OH is 4-days. (Testimony/ Affidavit of Michael Crooker; Defense Exhibit B)

16) Dailey was notified the afternoon of June 7, 2004 of the parcel. He took no action other than making inquiries with Legal Counsel and about dog-sniffs. He logged 1-hour dealing with the parcel and went about his other business including exercising at Planet Fitness. None of these other activities involved the detention of personal property. The parcel had now been detained for 1/2 day. (Testimony of Bryon Dailey; Government Exhibits 11 and 12)

17) On June 8, 2004 Dailey picked up the parcel from the Feeding Hills Post Office and again contacted Legal Counsel. He again logged 1-hour dealing with the parcel. He spent the rest of the day (8-hours) dealing with vehicle radio equipment and other matters, none of which dealt with the detention of personal property. The parcel had now been detained 1 1/2-days. (Testimony of Bryon Dailey; Government Exhibits 11 and 12)

18) On June 9, 2004 Dailey again contacted attorneys and again logged 1-hour dealing with the parcel. He spent the rest of the day (10-hours) on personal business, vehicle radio equipment, and other matters, none of which dealt with the detention of personal property. The parcel had now been detained for 2 1/2-days. (Testimony of Bryon Dailey, Government Exhibits 11 and 12)

19) In the first 3-days following the parcel detention, June 7, 2004, June 8, 2004 and June 9, 2004 Dailey logged 3-hours dealing with the parcel and 21-hours on other matters such as car radios and Planet Fitness. (Government Exhibits 11 and 12)

20) Dailey never contacted Mr. Paulus in Ohio to ask him if he had purchased any chemicals from Crooker. (Testimony of Bryon Dailey)

21) The parcel, weighing nearly 18 pounds and insured for $400, was not consistent with the offerings on the eBay seller list of April 22, 2004 that had prices of $10.00 and item weights of 1/4 and 1/2 pounds. (Government Exhibit 6; Testimony/Affidavit of Michael Crooker)

-13-

22) On June 10, 2004 Dailey took the parcel to a Postal Facility in Hartford, CT and X-Ray'd it. He believed that the X-Ray depicted some type of firearm. He logged 6-hours and spent the rest of the day (4-hours) on other matters, none of which involved the detention of personal property. The parcel had now been detained for 3 1/2-days. (Testimony of Bryon Dailey; Government Exhibits 11 and 12)

23) On June 11, 2004 Dailey logged 9-hours in observance of President Reagan's death and undertook no duties, including none related to Crooker's detained parcel. The parcel had now been detained 4 1/2-days. (Government Exhibits 11 and 12)

24) On June 12, 2004 Dailey logged 2-hours in working on an affidavit for a search warrant for the parcel. The parcel had now been detained for 5 1/2-days. (Government Exhibits 11 and 12)

25) On June 13, 2004 Dailey undertook no duties, including none relating to Crooker's detained parcel. The parcel had now been detained for 6 1/2-days. (Government Exhibits 11 and 12)

26) On June 14, 2004 Dailey obtained a search warrant at 4:55 P.M. and executed it at 5:05 P.M. The obtaining of the search warrant was 7 1/2-days into the parcel detention. (Search warrant, search warrant affidavit, search warrant return)

27) The parcel was opened and the firearm was discovered to be a nonfirearm air rifle. Further searching revealed a cylindrical device with threading that mated threading on the air rifle's muzzle. (Testimony of Bryon Dailey; Government Exhibits 17 and 20)

28) The entire parcel and all of its contents were formally seized. The search warrant only authorized the seizure of "a firearm" which was a reference to the X-Ray depiction attached to the search warrant application. (Testimony of Bryon Dailey)

29) Dailey did not know whether the cylindrical air rifle attachment would work with a firearm as opposed to an air rifle without testing, and it was not tested until 11-days later. (Testimony of Bryon Dailey; ATF Laboratory Report of June 25, 2004 testing attached to Defendant's Motion to Dismiss filed November 18, 2004)

30) Defendant Crooker was arrested on June 23, 2004 before the device was ever tested. (U.S. DIstrict Court Docket Entries Nos. 1, 2 and 3)

31) Search warrants can be obtained at night, on weekends, and on holidays. (Testimony of Patrick Burns)

32) Agent Burns also did not know if the cylindrical device would also work on a firearm without testing. (Testimony of Patrick Burns)

-14-

33) After Crooker's arrest on June 23, 2004 Agent Burns immediately opened the vehicle trunk and began going through its contents. This occurred in the middle of busy Springfield Street in Agawam where there was such a spectacle created that traffic in both directions was halted. (Testimony/Affidavit of Michael Crooker)

34) Crooker has never been provided with a written inventory of the June 23, 2004 vehicle search nor has one been provided to him in discovery. (Testimony/Affidavit of Michael Crooker)

35) While executing the residence search warrant on June 23-24, 2004 agents continued to search until "well after midnight" without asking for court approval. (Testimony of Patrick Burns)

36) By the time the search was completed on June 24, 2004, hundreds of items had been seized with no apparant connection to the Interstate Transportation of a Firearm-Silencer. (Testimony of Patrick Burns; Search Warrant Return)

37) An alleged postal rule purports to authorize the warrantless inspection of Parcel Post contents. (Government Exhibit 1) Another alleged postal rule says that a federal search warrant is nevertheless needed for seizures. (Government Exhibit 2)


Respectfully submitted,

*Michael Alan Crooker*

Michael Alan Crooker, pro se
Essex County Correctional Facility
20 Manning Ave.
Middleton, MA  01949

–15–

## AFFIDAVIT OF MICHAEL ALAN CROOKER

I, Michael Alan Crooker, declare as follows:

(1)  On June 7, 2004 at around Noon I attempted to mail a parcel which is the subject of this litigation.

(2)  Previous to this I was running an eBay business that involved many parcel mailings.  However I was kicked off eBay and my seller account suspended around the last week of April, 2004 for being delinquent in the payment of $1,300 in eBay seller fees. I have never been reinstated.

(3)  Because of the eBay suspension I had not mailed any parcels for several weeks prior to June 7, 2004.

(4)  The parcels that I had previously mailed were all very small, 2 pounds or less, and were almost never insured.  I had never mailed anything out of the Feeding Hills Post Office weighing more than 5 pounds or insured for over $100. Thus my 17 pound, 9 ounce parcel insured for $400 and mailed June 7, 2004 was not at all consistent with the earlier eBay connected parcel mailings.

(5)  I have mailed numerous Parcel Post packages to Ohio and Pennsylvania and I know from experience that package mailings to that area usually take 3-days.  Once I mailed a Parcel Post package out-of-state and it arrived in 1-day.  The USPS Website states that a Parcel Post package weighing 17 pounds, 9 ounces sent from Zipcode 01030 (Feeding Hills, MA) to Zipcode 45822 (Celina, OH) takes 4-days.

(6)  I have never heard of a "not sealed against inspection" postal rule and have always had an expectation that my parcels could not be seized, searched, or tampered with without a search warrant.  Previously I was subject to a mail seizure under a search warrant that was later found to be illegal due to the lengthy warrantless detention of that mail.  United States v. Mail Addressed to Post Office Box 4371, CR-85-1601-MP(Judge Freedman).

(7)  On June 23, 2004 at 11:46 A.M. I was arrested in front of the Catholic Church on Springfield Street in Feeding Hills after my vehicle was stopped by police.  Agent Burns put a military battle rifle to my head and forced me to the rear of my car.  He popped the trunk lid using the dash-mounted thrunk release. He immediately began rummaging around through the trunk and asking questions such as, "What is in these gas cans?"  While this was going on, traffic was halted on busy Springfield Street in both directions.

(8)  I have never been provided with a written inventory from the June 23, 2004 vehicle search.  Also none has been provided to Attorney Bongiorni in pretrial discovery.  I did hear about a firework in the trunk being blown up in a field, from the newspapers.

-16-

Pursuant to 28 U.S.C. §1746 I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 13th day of October, 2005.

S/ *Michael Alan Crooker*

Michael Alan Crooker
ECCF
PO Box 807
20 Manning Ave.
Middleton, MA  01949