## Declaration

I, Kevin O'Regan, state as follows:

1. I am an Assistant U.S. Attorney ("AUSA") in Springfield, Massachusetts and am responsible for the prosecution of <u>United States v. Michael Crooker</u>, Criminal No. 04-30034-MAP.

### June 23, 2004 Initial Appearance

2. On June 23, 2004, Michael Crooker was arrested on a complaint and brought before federal Magistrate Judge Kenneth P. Neiman. Former AUSA Thomas O'Connor represented the government before Magistrate Judge Neiman on that day. I have reviewed AUSA O'Connor's notes of that hearing. Included in AUSA O'Connor's notes is the following entry:

- KPN inclined to detain for two days for O'Regan to handle det. hrg.

3. This entry indicates to me that I was not present at the June 23rd hearing. Moreover, I recall that I was present with law enforcement agencies near Mr. Crooker's apartment while it was being searched on June 23rd.

4. I did represent the government during Mr. Crooker's appearance in Court on June 25, 2004. My notes from that day reflect three events in chronological order. First, I discussed with Deputy Marshal Gary Mattison Mr. Crooker's request to provide the government with information about a crack house and a heroin house in Springfield. Next, I discussed the silencer seized from Mr. Crooker's mail package with ATF Special Agent Patrick Burns. Agent Burns informed me that ATF had test fired

the silencer and that it was very effective, reducing the sound of a firearm by 22.6 decibels.  Lastly that day, I represented the government at Mr. Crooker's detention hearing.  Thus, it appears that the silencer was tested with a firearm before the detention hearing on June 25, 2004.  A copy of my notes from June 25, 2004, are attached hereto as Exhibit A.

    5.  Although my notes do not reflect a conversation with Mr. Crooker on June 25th, I do recall having a conversation with him before Magistrate Judge Neiman came on the bench.  I remember Mr. Crooker raising the issue of the silencer being used to silence an air gun and my commenting to Mr. Crooker that it was an interesting issue.  I have a vague memory of Mr. Crooker discussing the effect of testing the silencer with a firearm, but I do not remember exactly what he said.  I did not understand from that informal conversation with Mr. Crooker that a specific request for particular testing or preservation of evidence had been made.

<u>Motion for Restoration of Commissary Funds</u>

    6.  At about the time Mr. Crooker made his motion for the USMS to restore his commissary funds on November 10, 2005, I began preparing in earnest for the trial of <u>United States v. Ivan Teleguz</u>, Criminal No. 02-20043-MAP, which was scheduled to begin on November 28, 2005.

7. At that time, there were three AUSAs working on Mr. Crooker's case. AUSA Jeffrey Auerhahn in the Boston office was assigned to work on the case concerning Mr. Crooker's possible manufacture or possession of ricin. AUSA Ariane Vuono in the Springfield office was assigned to work with me on this pending case and a potential case involving, among other things, explosives and other firearms. I was aware that Mr. Crooker had filed his motion to restore commissary funds from Wyatt, but I did not focus on it sufficiently, in part because I was preparing for the Teleguz trial, in part because I did not appreciate its effect on the USMS and in part because I was not sure whether AUSA Vuono or I should handle it.

8. When the Court granted Mr. Crooker's motion without opposition on November 30, 2005, I was beginning the Teleguz jury trial. Initial jury selection and opening statements were to begin on November 28, 2005, but they were postponed at the last moment until December 1, 2005. The trial lasted two weeks.

9. During this time, AUSA Vuono and the Springfield office's long-time office manager, Laurie-Ann Potter, announced that they were leaving the U.S. Attorney's Office. As Chief of the Springfield office, I was responsible for making sure that their work continued to be done. Since neither Ms. Vuono nor Ms. Potter have been replaced, this has been a challenging and time consuming job. Until recently, it required me to take on a number of their responsibilities.

10. Since November 30, 2005, there have been communications between the USMS, Wyatt and the U.S. Attorney's Office about how to respond to the Court's allowance of Mr. Crooker's motion. Unfortunately, no action was taken before Mr. Crooker moved to hold the USMS in contempt.

11. I relate the facts summarized in the previous five paragraphs only to indicate in part why I did not focus sufficiently on Mr. Crooker's motion or the Court's order. In spite of my other responsibilities or confusion about how to respond, the government should have opposed Mr. Crooker's motion and moved to vacate the Court's November 30, 2005, order. I did not intend to demonstrate disrespect for the Court and apologize for not responding to Mr. Crooker's motion and the Court's order in a timely manner.

12. In preparing the government's response to Mr. Crooker's motion for contempt, I have obtained Mr. Crooker's disciplinary reports from Wyatt. They reflect that Mr. Crooker received over thirty disciplinary reports from Wyatt. Approximately eleven of the reports, copies of which are attached hereto as Exhibit B, involved the destruction of facility property.

13. It is my understanding that the $435 Mr. Crooker seeks to have unfrozen from his commissary account were frozen by Wyatt because of the damage he caused to the facility. Thus, the dispute which is the subject of Mr. Crooker's motion relates to internal matters at Wyatt involving Mr. Crooker's destruction of

property and Wyatt's attempt to obtain payment for the damages. They do not appear to be related to issues that are relevant to the pending criminal case.

### Selective Prosecution Motion (Pending)

14. Mr. Crooker was prosecuted in this case because of his extensive criminal record and history of engaging in activity that had the potential to be dangerous to others. The information provided to the Court in the first affidavit for a search warrant reflected that Mr. Crooker had continued to engage in dangerous behavior with a disregard for the safety of others. Mr. Crooker told a potential customer, in substance, that he sent dangerous items like nitric acid in the mail and that he had no concerns for postal regulations. When he was asked by a postal employee what was contained in the package he was mailing that contained the silencer, Mr. Crooker did not reveal that the package contained an airgun and a silencer. Instead, he deflected the postal employee's inquiry by indicating merely that they were "metal parts."

15. Mr. Crooker's litigation history with federal agencies had nothing to do with the decision to prosecute him in this case. To the contrary, it is my general understanding that Mr. Crooker's litigiousness makes law enforcement wary of dealing with him. In this case the government decided that Mr. Crooker's significant criminal history and ongoing criminal behavior warranted his prosecution, in spite of what I understand will be ongoing litigation for some time.

16. Because Mr. Crooker has not identified specific individuals whom he claims were similarly situated to him, I am unable to distinguish Mr. Crooker's situation from that of the other individuals. If I were to compare Mr. Crooker with others I would review, among other things, the characteristics of the silencers involved, the criminal histories of the defendants, their ongoing criminal activity and their personal circumstances. In my view, all of these factors and others would be relevant to a prosecution decision.

<u>DECLARATION</u>

May 8, 2006

I, Kevin O'Regan, Assistant U.S. Attorney, declare that the foregoing is true and correct, to the best of my knowledge, information, and belief, under penalty of perjury. <u>See</u>, 28 U.S.C. Section 1746.

/s/ Kevin O'Regan
Kevin O'Regan
Assistant U.S. Attorney