```
                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA  )
                          )
          v.              )    Criminal No. 04-30034-MAP
                          )
MICHAEL CROOKER,          )
          Defendant.      )
```

Government's Supplemental
Opposition to Outstanding Pretrial Motions

The United States of America, by Michael J. Sullivan, United States Attorney for the District of Massachusetts, submits this memorandum in further opposition to Michael Crooker's pending pretrial motions. The government continues to rely on its prior memoranda in opposition to Mr. Crooker's motions and will not repeat all of the arguments made therein.

1. Motion to Dismiss due to Deprivation
   of Speedy Trial and Violation of 18 U.S.C. § 3164

The government has previously opposed this motion.

The Court has requested that the government supplement its response in light of the Supreme Court's recent decision in United States v. Zedner, No. 05-5992, 547 U.S. __ (June 5, 2006).

In Zedner the Supreme Court rejected the validity of a defendant's voluntary "waiver for all time" of his speedy trial rights. Slip op. at 9. The Court also found that a district court must make its findings related to excludable delay on the record and that, although the best practice was "for a district court to put its findings on the record at or near the time when it grants the continuance," at the least the district court's

findings had to be made prior to ruling on a motion to dismiss. Id. at 16.

As noted in an earlier memorandum, Mr. Crooker was indicted on July 14, 2004. Five orders of excludable delay have been entered in this case by either Magistrate Judge Neiman or this Court.

Docket No. 27 reflects that an order of excludable delay from July 15, 2004, to January 20, 2005 was entered by Magistrate Judge Neiman in writing on November 3, 2004, based on the Magistrate Judge's findings in open court related to pretrial motions and the interests of justice. This exclusion was agreed to by the parties in their Status Report filed with the Court on November 1, 2004. (Docket No. 24).

Docket No. 37 reflects that an order of excludable delay from January 20, 2005, to February 23, 2005 was entered by Magistrate Judge Neiman in writing on January 25, 2005, based on the Magistrate Judge's findings in open court and the agreement of the parties related to pretrial motions and the interests of justice. This exclusion was agreed to by the parties in their Status Report filed with the Court on January 25, 2005. (Docket No. 24).

On February 28, 2005, this Court endorsed an order of excludable delay for the period from February 23, 2005, to March 25, 2005, on the Government's speedy trial motion dated February

25, 2005, (Docket No. 39). This motion was assented to by Mr. Crooker's counsel and was based on the defendant's request to file additional motions. The Court stated that the motion was allowed because "by agreement in these circumstances, the interest of justice outweigh[] the usual interest in a speedy trial."

On May 16, 2005, this Court endorsed an order of excludable delay for the period from March 25, 2005, to May 6, 2005, on the Government's speedy trial motion dated May 6, 2005, (Docket No. 41). The motion was based on the passing of a deadline for Mr. Crooker to file motions. Mr. Crooker did not file an opposition to this motion for an order of excludable delay. The Court stated that the motion was allowed because, "In these circumstances, the interests of justice outweigh the usual interest in a speedy trial."

Finally, on May 23, 2005, this Court endorsed an order of excludable delay for the period from May 16, 2005, to August 23, 2005, on the Government's assented to speedy trial motion dated May 20, 2005, (Docket No. 43). The motion was based on Mr. Crooker's request to file motions. The Court stated that the motion was allowed because, "In these circumstances, the interests of justice outweigh the usual interest in a speedy trial."

Since August 23, 2005, many successive and overlapping pretrial defense motions have been pending before the Court. All of this time is automatically excluded from the Speedy Trial clock. See 18 U.S.C. § 3161(h)(1)(F).

In light of the Court's contemporaneous findings of excludable delay in this case, the Supreme Court's requirements for orders of excludable delay in Zepner have been satisfied. To the extent that the Court disagrees, the government respectfully requests that the Court make appropriate findings at this time, prior to ruling on Mr. Crooker's motion to dismiss. See Zepner, slip op. at 16.

2.  Motion to Suppress Compaq Computer

The government opposes this motion.

Four search warrants were issued by Magistrate Judge Neiman or this Court in relation to Mr. Crooker's computer. The first warrant was issued on June 23, 2004, and authorized the search of Mr. Crooker's apartment at Apt. 29, 1162 Springfield Street, Feeding Hills, MA 01030. See Gov't. Ex. 5. The computer was seized pursuant to this warrant. The second warrant was issued on July 2, 2004, as a cautionary measure to explicitly authorize the search of the seized computer. See Gov't. Ex. 11. The government attempted to search the computer and make a forensic image of its hard drive, but was unable to do so because the hard drive was password protected. See Gov't. Ex. 12, ¶ 6. As a

result, the government applied for and obtained a third warrant for the computer on July 12, 2004, so that the computer could be sent to the FBI laboratory in Quantico, Virginia, to obtain access to the hard drive.  See Id.; Gov't. Ex. 13.  The hard drive of the computer was accessed and then imaged by the FBI in Virginia on or about July 26, 2006.  See Gov't. Ex. 25, ¶ 12.  Finally, the fourth warrant for the computer was obtained on July 28, 2004, authorizing the search of the computer.  Gov't. Ex. 16.

According to the testimony of FBI computer analyst Stephen Swanson, he conducted a forensic examination of an imaged copy of the hard drive prior to the expiration of the July 28, 2004, warrant.  Mr. Swanson examined the hard drive according to a protocol that focused on the July 28, 2004, warrant and copied files to a computer disk that he forwarded to Special Agent Richard Winfield for further review.  Thereafter, Special Agent Winfield reviewed the computer disk looking for evidence specifically related to this case.

The facts set forth during the suppression hearing reflect that the government acted with diligence and good faith in obtaining the original search warrant for Mr. Crooker's apartment and then in examining his computer, which was password protected and partially encrypted.  The mere fact that the government returned to the Court three times within six weeks for additional

search warrants explaining the state of the examination of Mr. Crooker's computer reflects the agents' diligence and good faith.

Assuming that for arguments sake Mr. Crooker can demonstrate a technical violation of the time limit set forth in Rule 41 because there was no search warrant in effect on July 26, 2004, the date the hard drive was actually imaged in Virginia, suppression of the results of the search would not be appropriate. Violations of Rule 41's timing requirements are not constitutional. See United States v. Syphers, 426 F.3d 461, 469 (1st Cir. 2005).

In Syphers, the First Circuit explained the contours of the Fourth Amendment and Rule 41 as they applied to computer searches:

> The Fourth Amendment itself "contains no requirements about *when* the search or seizure is to occur or the *duration*." United States v. Gerber, 994 F.2d 1556, 1559-60 (11th Cir.1993). However, "unreasonable delay in the execution of a warrant that results in the lapse of probable cause will invalidate a warrant." United States v. Marin-Buitrago, 734 F.2d 889, 894 (2d Cir.1984). The restrictions in Rule 41 "not only ensure that probable cause continues to exist, but also that it is the neutral magistrate, not the executing officers, who determines whether probable cause continues to exist." Id. The policy behind the ten-day time limitation in Rule 41 is to prevent the execution of a stale warrant. "A delay in executing a search warrant may render stale the probable cause finding." United States v. Gibson, 123 F.3d 1121, 1124 (8th Cir.1997). A delay in execution of the warrant under Rule 41 does not render inadmissible evidence seized, absent a showing of prejudice to the defendants resulting from the delay. See United States v. Cafero, 473 F.2d 489, 499 (3d Cir.1973). Courts have permitted some delay in the execution of search warrants involving computers because of the complexity of the search. See, e.g., United States v. Gorrell, 360 F.Supp.2d 48, 55 n. 5

>   (D.D.C.2004) (ten-month delay in processing of computer and
>   camera seized, although "lengthy," "did not take the data
>   outside the scope of the warrant such that it needs to be
>   suppressed"); United States v. Triumph Capital Group, Inc.,
>   211 F.R.D. 31, 66 (D.Conn. 2002) ("[C]omputer searches are
>   not, and cannot be subject to any rigid time limit because
>   they may involve much more information than an ordinary
>   document search, more preparation and a greater degree of
>   care in their execution.").

In this case, the original search warrant for Mr. Crooker's apartment authorized the seizure and inspection of his computer. Thereafter, the government was diligent in attempting to unlock Mr. Crooker's computer and in examining his hard drive. Probable cause to believe that it contained evidence authorized by the original warrant continued to exist and did not become stale. Nor has Mr. Crooker shown any prejudice from the alleged delay, except that he does not want the evidence retrieved from the computer to be used against him. As a result, his motion to suppress the results of the search of his computer should be denied.

3.   Renewed Motion for Rule 16 Sanctions

The government opposes this motion.

Mr. Crooker claims that the government has intentionally manipulated discovery in this case to his prejudice. There is no evidence to support Mr. Crooker's claim. At most, Mr. Crooker can claim inadvertent late disclosure of the third and fourth computer warrants. These were the subject of extensive testimony

at the suppression hearing.  Mr. Crooker points to no actual prejudice as a result of the late disclosure.

In the absence of any intentional misconduct or actual prejudice, Rule 16 sanctions would be inappropriate.

4. <u>Motion to Suppress Sealed Mail</u>

The government opposes this motion.

Mr. Crooker claims that the government caused employees at the Wyatt Detention Facility to "unlawfully conduct warrantless searches and seizure of defendant's First Class mail."  To the contrary, both federal and state regulations permitted the opening of Mr. Crooker's mail.  Ronald Letourneau, an investigator at Wyatt, testified that he was permitted by the detention facility's internal regulations to read outgoing mail.  The government then obtained copies of the letters properly through the service of lawful grand jury subpoenas.

Federal regulations provide for the opening of incoming and outgoing inmate mail.  According to 28 CFR § 540.14(a) (2005), "(a) Institution staff shall open and inspect all incoming general correspondence.  Incoming general correspondence may be read as frequently as deemed necessary to maintain security or monitor a particular problem confronting an inmate."  According to 28 CFR § 540.14(b) (2005), "[e]xcept for 'special mail,' outgoing mail from a pretrial inmate may not be sealed by the inmate and may be read and inspected by staff."  "Special mail"

is defined as correspondence with certain federal and state officials, as well as law enforcement, attorneys, and the media. 28 CFR § 540.2 (c) (2005).

The Rhode Island legislature also has authorized the Director of the state's Department of Corrections to:

> Make and promulgate necessary rules and regulations incident to the exercise of his or her powers and the performance of his or her duties, including, but not limited to, rules and regulations regarding nutrition, sanitation, safety, discipline, recreation, religious services, <u>communication</u>, and visiting privileges, classification, education, training, employment, care, and custody <u>for all persons committed to correctional facilities</u>.

R.I. Gen. Laws § 42-56-10 (22) (current through January 2005 Sess.)(emphasis added). Following this mandate, the Rhode Island Department of Corrections adopted a policy regarding inmate mail. <u>See</u> <u>Policy and Procedure</u>, policy no. 24.01-3 DOC (RI Dept. Corrections June 17, 2002). According to this policy, outgoing inmate mail can be read so long as it is not privileged. <u>Id.</u> Further, the state of Rhode Island mentions this practice on their website. <u>See</u> Dept. of Corrections, <u>Frequently Asked Questions—Mail</u>, http://www.doc.state.ri.us/faq /mail_faq.htm.

Given this common policy, a reasonable person in Mr. Crooker's position would have understood that the reading of outgoing inmate mail was general practice and understood that his mail would also be inspected.

Moreover, Mr. Crooker has failed to demonstrate that as a federal pretrial detainee he had a reasonable expectation of

9

privacy in his outgoing mail. As a result, his motion to suppress his prison mail should be denied.

5.   Motion to Suppress Wyatt Detention Facility Telephone Calls

The government has opposed this motion previously and continues to do so.

a.   Authority of Wyatt Staff to Record Telephone Calls

As a threshold matter, Title III contains two law enforcement exceptions, one relating to interceptions and one relating to disclosure. 18 U.S.C. §2510(5)(a)(ii) identifies intercepted communications as those which are recorded "by an investigative or law enforcement officer in the ordinary course of his duties" and exempts them from the reach of Title III. 18 U.S.C. §2517(1) addresses disclosure and provides that:

> "Any investigative or law enforcement officer who . . . has obtained knowledge of the contents of any wire, oral, or electronic communication . . . may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate."

This statute further defines officer as including "any Officer . . . of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter." See 18 U.S.C. §2510(7). Federal corrections officers clearly fall within the meaning of "investigative or law enforcement officers." See Crooker v. United States Department of Justice, 497 F. Supp. 500, 503 (D.Conn. 1980).

Similarly, private company employees that operate in privity with an authorized agency are also exempt from Title III's requirements. In United States v. Rivera, 292 F.Supp. 2d 838 (E.D. Va. 2003), the district court examined § 2510 and ruled that the law enforcement exception extended to private companies such as Verizon, provided that privity with the appropriate government agency existed. According to Rivera, any entity acting as an agent of a prison would be a law enforcement officer pursuant to § 2510(7). Since the Wyatt staff operated under contract with the United State's Marshals Service to house federal pretrial detainees, the Wyatt staff were exempt from Title III in the same way the Marshals staff was.[1]

Title III's legislative history also supports the privity argument, stating that "individuals operating under contract with the Government" may properly monitor and intercept in compliance with the statute's law enforcement exception. See S. REP. No. 99-541, at 31, 1986 U.S. Code Cong. & Admin. News, p. 3555 (1986).

    b.   Consent Exception to Title III

Even if the Wyatt staff did not have authority to tape Mr. Crooker's telephone calls as law enforcement officers, they were

---

[1] The government respectfully disagrees with the district court holdings in United States v. Faulkner, 323 F. Supp. 2d 1111 (D. Kan. 2004), and Huguenin v. Ponte, 29 F.Supp. 2d 57 (D.R.I. 1998), and urges this Court to follow Rivera.

11

authorized to do so based on Mr. Crooker's consent. As explained in the government's earlier memo and then proved at the suppression hearing, at the beginning of each relevant telephone call made by Mr. Crooker from the detention facility, a recording was played over the detention facility's phone system which stated:

> This call may be recorded or monitored. I have a collect call from: [Mike], an inmate at Donald W. Wyatt Detention Facility. . . . To accept dial zero and hold. To refuse dial five and hang up. Thank you.

Thereafter, approximately every six minutes a recording was played stating, "This call may be recorded or monitored." The recordings of these telephone calls introduced into evidence at the suppression hearing demonstrated that these warnings were repeated, audible and at times reacted to by either Mr. Crooker and his brother. Moreover, Mr. Crooker's brother warned Mr. Crooker on several occasions not to talk on the telephone. Since Mr. Crooker consented to the recording of his telephone calls, the recordings were not made in violaton of the federal wiretap statute. See United States v. Footman, 215 F.3d 145, 154-55 (1st Cir. 2000)(prisoner consent sufficient); Gilday v. Dubois, 124 F.3d 277, 296 (1st Cir. 1997)(The consent exception to Title III should be broadly construed to encompass implied consent.)

6.  Mr. Crooker does not Have Standing to Contest the Searches of his Brother's and Father's Residences

Mr. Crooker's motions to suppress evidence seized from his brother's and father's residences should be denied in part because he has failed to demonstrate that he had a privacy interest in those residences sufficient to give him standing to challenge the searches.

To be able to assert violation of the privacy interest guaranteed by the Fourth Amendment, one has to have legal standing to bring such a claim.  Without standing, a search or seizure cannot be challenged.  United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).  The "vicarious assertion of another's constitutional rights is insufficient."  Rakas v. Illinois, 439 U.S. 128, 134 (1978).

Standing requires that a criminal defendant have a legitimate expectation of privacy.  United States v. McHugh, 769 F.2d 860, 864 (1st Cir. 1985).  The Supreme Court has set forth a two-part test for determining if the defendant had such an expectation of privacy.  Id. (noting Smith v. Maryland, 442 U.S. 735 (1979)).  The defendant must have demonstrated a subjective intent that '"he seeks to preserve [something] as private."' Smith, 442 U.S. at 740 (quoting Katz v. United States, 389 U.S. 347, 351 (1967).  Second, this subjective expectation of privacy must be objectively reasonable under the circumstances.  Id. (citing Katz 389 U.S. at 353).

13

The First Circuit has identified more concrete factors for determining a legitimate expectation of privacy, those factors being:

> possession or ownership of the area searched or the property seized; prior use of the area searched or the property seized; legitimate presence in the area searched; ability to control or exclude others' use of the property; and a subjective expectation of privacy.

United States v. Gomez, 770 F.2d 251, 254 (1st Cir. 1985) (citing United States v. Lochan, 674 F.2d 960, 965 (1st Cir. 1982)). These factors have been applied repeatedly in the First Circuit. See e.g. United States v. Dunning, 312 F.3d 528, 532 (1st Cir. 2002) (involving a residence the defendant did not have the right to access without permission, and could not exclude others from); United States v. Torres, 162 F.3d 6, 10 (1st Cir. 1998) (involving a casual visitor); United States v. Battle, 400 F. Supp. 2d 355, 360 (D. Mass. 2005) (involving a guest who had not stayed in the apartment prior to the incident in question); United States v. Mendoza Rolon, 326 F. Supp. 2d 243, 249 (D.P.R. 2004) (holding no expectation on privacy based of First Circuit factors).

In this case, Mr. Crooker has failed to demonstrate the threshold requirements for standing. He testified that he did not have an ownership interest in either residence. Nor did he live in either residence. He rarely went inside his brother's residence and when he did visit they usually met in his brother's

carport. Similarly, prior to the search of Mr. Crooker's father's residence he had been effectively thrown out of the residence because he had stolen money from his father and was addicted to drugs. Mr. Crooker did not have the authority to exclude others from either property and did not have a reasonable subjective expectation of privacy in either location.

In the absence of standing, Mr. Crooker's motions to suppress evidence seized from these locations should be denied.

`
## Conclusion

For the foregoing reasons, Mr. Crooker's pending pretrial motions should be denied.

>                    Respectfully submitted,
>                    MICHAEL J. SULLIVAN
>                    United States Attorney
>
> by:  /s/ Kevin O'Regan
>      Kevin O'Regan
>      Assistant U.S. Attorney
>
>      Date: June 15, 2006

## Certificate of Service

June 15, 2006

I certify that I caused the foregoing document to be electronically delivered to counsel for the defendant, Vincent Bongiorni, Esq, 95 State Street, Springfield, MA 01103.

>                    /s/ Kevin O'Regan
>                    Kevin O'Regan
>                    Assistant U.S. Attorney