UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA )
                         )
vs.                      )    NO.  04-30034-MAP
                         )
MICHAEL CROOKER           )


**DEFENDANT'S CLOSING MEMORANDUM REGARDING OUTSTANDING MOTIONS**

Defendant Crooker submits the present memorandum in further support of his outstanding motions and in opposition to Government filings.

1. Motion to Dismiss Due to Deprivation of Speedy Trial and Violation of 18 U.S.C. §3164

This issue is covered by Defendant's Fourth Motion to Dismiss Due to Deprivation of Speedy Trial (Caused by Government Misconduct) dated June 15, 2006. Because of the Government's delayed discovery disclosures in September 2005 and May 2006 (16 months and 23 months into defendant's pretrial detention) that directly caused the "Round Two" and "Round Three" Motion to Suppress proceedings, and the cancellation of the November 7, 2005 Trial date, all days from November 7, 2005 to the present cannot be considered as excluded under 18 U.S.C. §3161(h)(1)(F). As for the 90 day limit on detention in 18 U.S.C. §3164, Crooker has been repeatedly complaining as far back as late July and early August of 2005 in letters to the court and in motions.

2. Motion to Suppress Compaq Computer

It is incorrect that the original Search Warrant authorized an "inspection of his computer." It did not. The first warrant only authorized the seizure of any computers.

The Government attempts to characterize Crooker's claims as mere technical time-limit violations of Rule 41, but it is in fact more than that. There was an utter lack of jurisdiction, for the courts in the District of Massachusetts were without the power to issue search warrant for property that was at the time of the applications in the District of Connecticut or Virginia. And Crooker has suffered prejudice other than "he does not want the evidence retrieved from the computer to be used against him." Denying him his exculpatory evidence with which he needs to prove his innocence is highly prejudicial.

Due to the above issues, the analogy to ta file cabinet search is simply not correct. The first warrant authorized a seizure only, not a search, and the subsequent searches were

warrantless or were based on warrants issued without jurisdiction from a wrong Judicial District.

### 3. Exculpatory Evidence Issue- Return of the Compaq Laptop

The defense has made a strong ex-parte showing for the need to access the encrypted files residing on the seized laptop.

There is a great likelihood that the evidence cannot be obtained any other way and that the individual involved will not remember or will exercise his Fifth Amendment privilege.

It has now been two full years and the Government is no longer conducting any searches of the computer. In fact, ATF Agent Burns testified that the laptop was no longer needed because its hard-drive had been mirror-imaged. (May 15, 2005 Transcript at 46)

The Government has imaged all available data and they will not be introducing the actual computer.

They are holding the computer for no other reason than to deny the defense their exculpatory evidence.

The Government's bald claim that they need the laptop for another investigation should not be able to trump a documented need for exculpatory evidence. No detailed reason has been given as to how the actual laptop, as opposed to mirror-image copies of is hard-drive, could be of assistance in any other investigation. But even if there was such a reason given, the need for exculpatory evidence should trump that need.

### 4. Renewed Motion for Rule 16 Sanctions

The evidence to support Crooker's claim is that it has happened twice, not once. It first happened in September 2005 and then again in May 2006. The prejudice Crooker has suffered is enormous and includes all days in custody since the November 7, 2005 trial date was scuttled by the prosecutor.

The September 2005 violation has never even been justified though the prosecutor tried to blame it on the fact that he became aware that he had to prove "knowledge" in an 18 U.S.C. §922(g) case involving an alleged firearm silencer. But it is not the defense's fault that the prosecutor did not do his homework from the beginning in June 2004. Yet it is Crooker who is serving nearly an extra year in pretrial detention due to the prosecutor's lack of readiness.

Furthermore, any prosecutor should have known that the knowledge element was required. It is in the statutes, in the case law, and in the U.S. Attorney's Manual.

The second violation that occurred in May 2006 is almost beyond belief. The claim that 3 more search warrant, their applications, and 115 surreptitiously copied First Class letters were an "inadvertent late disclosure" is ridiculous. The absolute, very last document disclosed on May 10, 2006 was the Fourth Search Warrant Affidavit for the Compaq Computer that revealed it was searched when no search warrant was then outstanding, and revealed that the Fourth Warrant was

issued without jurisdiction from the District of Massachusetts for property located in Virginia. This was no coincidence. The very last document to be disclosed happens to be the one that helps the defense the most and damages the Government's case the most.

Intentional misconduct and actual prejudice has been demonstrated by a preponderance of the evidence.

### 5. Motion to Suppress Sealed Mail

The claim that Ronald Letourneau testified that he was permitted by Wyatt's Internal regulations to read sealed, outgoing mail is a complete fabrication, and once again, an attempt to deliberately mislead the court. The ay 15, 2006 transcript at pages 154-181 show that Letourneau never said a single word about mail. His testimony only concerned telephones.

It may be true that Federal Prison Regulation at 28 C.F.R. §540.14 that used to provide fir the sealing of mail by pretrial detainee now do not in the 2005 version, but it is of no consequence to the present matter. Wyatt is not governed by Federal Prison regulations; they have their own. See Huguenon v. Ponte, 29 F. Supp. 2d. 57, 67 (D.R.I. 1998):

> "The Bureau of Prisons Regulations specifically list those institutions that fall under the direction and control of that agency. . . Wyatt is not listed in this otherwise exhaustive list. . . the Federal Bureau of Prisons simply does not recognize Wyatt as one of the eighteen penal institutions that falls within its Northeast Region."

Nor does the Director of the Rhode Island Department of Corrections have anything to do with Wyatt. Wyatt is not a "Correctional Facility;" it is a detention facility. Wyatt is not part of the Rhode Island DOC or under their jurisdiction.

In an obvious glaring omission the Wyatt Regulations that do permit the sealing of detainee mail are not even mentioned by the Government.

At Wyatt's facility, any reasonable person, whether it be a Federal pretrial detainee, as Suffolk County, MA prisoner, or a North Carolina prisoner (three classes that have been held at Wyatt) faced with rules that permit the sealing of mail and depositing same in locked letter boxes have a reasonable expectation that their mail will not be broken open and surreptitiously copied and disseminated.

Furthermore, with respect to pretrial detainees, "the constitutional standard by which the legality of the conditions of confinement for pretrial detainees is to be measured differs from that applicable in the case of sentenced inmates." Lareau v. Manson, 651 F.2d 96, 102 (2nd Cir. 1981)(Hartford CCC Case).

6. <u>Motion to Suppress Wyatt Telephone Calls</u>

A. Authority to Record

Ronald Letourneau testified that Wyatt staff are not investigational or law enforcement officers. That should be the end of the story, but as usual, the Government wants to eat their cake and have it too. When it comes to Wyatt staff stealing, cashing, and forging detainee monetary instruments, the U.S. Marshal's Service has no control over them. But now that illegally taped telephone calls are at issue, he argument is made that Wyatt staff, and the U.S. Marshal's Service are "partners"in "privity." This is not what the Rhode Island Federal Court found, <u>Huguenin v. Ponte</u>, 29 F. Supp. 2d 57 (D.R.I. 1998).

B. Consent

Crooker did not consent, nor did he sign the consent form. Wyatt's Ronald Letourneau rather brazenly testified that he thought Wyatt could do wiretapping without consent, because the warden told him so. But we know that not to be the case from the <u>Huguenin v. Ponte</u> decision noted above.

Everyone agreed, or Crooker's testimony stands unrebutted that:

1)  He received no notice by way of an Inmate Handbook;
2)  All his calls were from Segregation, where no signs are posted;
3)  Only attorney calls could be made during the day shift in Segregation and all the calls Crooker placed were Day Shift calls;
4)  Attorney calls are not supposed to be monitored;
5)  Crooker and others often faked attorney calls in order to call in the daytime;
6)  Even attorney calls that are not supposed to be monitored still have the notice recording in the background. All calls do that whether actually recorded or not;
7)  The beginning call notice is not heard by the Segregation detainee because the guard would place the call to try to thwart phony attorney calls.

Therefore, at best, the Government is claiming that the faint background recordings (that operate whether it is a real attorney call, phony attorney call, or social call) constitutes a voluntary consent.

Even if there was some limited notice, this does not equate to consent when given by private persons who are not law enforcement officers.

Because Wyatt is a private, for profit, corporate entity, their telephone notices and

recordings would be no more legal than if the local Walmart office did it to their workers' payphones in order to prevent loitering and drug deals.

### 7. Standing to Contest Harold Crooker Search

Crooer concedes that he lacks standing with respect to the Stephen Crooker search, but he clearly <u>does</u> have standing as to the Harold Crooker search. Despite his drug addiction, he was the caretaker of the property for five winters in a row (1999-2004), he did live there during one of those winters (1999-2000 season), and he had permission to store his property there.

And despite the issue of the borrowed $300.00, Crooker's father still allowed him to store his property there and access it.

This gave him a reasonable expectation of privacy from 1999-2000 right on up to July 2004.

### 8. The Harold Crooker Search

The <u>only</u> probable cause for anything at his location came form Heidi Provost, a*k*a, "CI-1."

Crooker's affidavit regarding Heidi Provost, their making fireworks together, of labware not being used or useful to make fireworks, and of Heidi Provost's ignorance of what a "beaker" is, and the unlikelihood of her ever using that term, went unrebutted.

ATF Agent Burns did not inform the Magistrate of Heidi Provost's ex-convict status, her unfit mother status, her restraining orders to keep her away form her mother and from Crooker, or her lack of education or drug use.

The face of the search warrant does not reference any "attachment" of items authorized to be seized, in violation of the U.S. Supreme Court's <u>Groh v. Ramirez</u> decision. ATF Agent Burns could not tell us if the attachment was served with the search warrant and he evaded the question by saying that we should ask Agent Murray. May 15, 2006 Transcript at 60-62. Hence the Government has not sustained its burden with respect to the attachment that is not referenced on the face of the search warrant.

The search was an illegal nighttime search that went well beyond 10:00 p.m. without court authorization. May 15, 2006 Transcript at 67-68.

### 9. June 23-24, 2004 Apartment Search

The search was an illegal nighttime search that went until the following morning around 3:00 a.m., without court authorization (after 10:00 p.m.). May 18, 2006 Transcript at 43-44.

### 10. July 15, 2004 Apartment Consent Search

Crooker was the victim of circumstances and did not voluntarily abandon his property.

The Government should not be allowed to arrest Crooker as opposed to summoning him, detain him as opposed to pretrial releasing him, and then profit by his inability to secure his property.

Had the Government not detained him, he would have still been living there on July 15, 2004, and surely would not have consented to a search, or he would have by then moved out of there, but with all of his belongings.

### 11. Automobile Inventory Search

Crooker's testimony of a Federal Agent Search of the trunk at the arrest scene, as opposed to an alleged Agawam Police inventory search, is credible because:

- a. Officer Camerlin states that the trunk was already opened when he arrived. Transcript May 15, 2006 at 187, 198 and May 18, 2006 at 11;
- b. Agent Burns admits posing questions to Crooker about the gas cans in the trunk;
- c. Agent Burns says that his partner, Shink, might have popped the trunk release;
- d. It is suspicious that a whole extra tow trip was done ti unnecessarily bring the vehicle to the Agawam Police Department just to do a routine inventory search when it could have been done in the nearby church parking lot.

If there was a legitimate Agawam PD inventory search, which the defense disputes, it was spoiled by the Federal Agent search that was done in the trunk before Camerlin came on scene.

### 12. Seizures Outside Scope of Searches

Many hundreds, and in the case of the laptop, hundreds of thousands, of items were seized outside the scope of the searches that renders the searches to be illegal general searches:
- a. June 23, 2004 Apartment Search;
- b. July 15, 2004 Harold Crooker Search;
- c. Computer Laptop Search;
- d. Parcel Search on June 14, 2004.

### 13. Zippered Pocket of Gun Case

A finding of fact should be made that the air silencer was in the zippered pocket because:

a. The pre-arrest email Crooker sent to Mike Paulus describing the packing of the parcel supports his post-arrest testimony, and;
b. Agent Burns' testimony that it was not in the zippered pocket was discredited when he completely back-pedaled and admitted that it was Dailey or Shink who actually took the items out of the box and he could not actually see how that occurred.

The issue is not whether a second search warrant should have been obtained to search the zippered pocket; the issue is that the search was completed and executed once the first item out of the box turned out tot be an air rifle and not a shotgun. The box should have been resealed at that point, as there was no cause to search it further.

### 14. Gunshot Residue Test Issue

Crooker's story of requesting a GSR TEST to AUSA O'Regan is credible and is not denied by O'Regan; the only dispute is to whether it occurred on June 23 or June 25.
Crooker's story of a GSR protocol at ATF in 1979 from the FOIA documents at Danbury is credible and went unrebutted.
Agent Burns wrongly testified that the GSR Test was not done because the device could not be disassembled. September 27, 2005 Transcript at 59-60.
Examiner Craze's testimony that they stopped doing GSR Tests 8 years ago due to budgetary issues does not have a ring of truth since the alleged changes in procedure was never documented in any memoranda, and Craze simply stopped doing them because "someone told him to." (But he doesn't know who).
A GSR Test is a valuable investigatory tool not likely to be discontinued - - there are many cases such as the Syverson case where defendant's claim that the alleged silencer is really something innocent and not a silencer; in Syverson it was claimed it was a "muzzlebreak."
The defense requests that there be a ruling or stipulation that the airgun device has never been fired through with a firearm.

### 15. Selective Prosecution Motion

A first-in-the-nation prosecution of someone over an air rifle silencer as a "firearm silencer" makes this one of those special cases.
The 24 letters wherein no one else was prosecuted makes a substantial showing that

merits an Evidentiary Hearing.

The Government cannot credibly claim that the defense has not provided the names of the persons not prosecuted; that information was deleted from the documents <u>by the Government</u> and only they know who the persons are.

16. <u>Renewed Motion to Reconsider Capability Versus Designed or Intended in the Interpretation of the Silencer Definition in 18 U.S.C. §921(a)(24)</u>

A Government promoted "capability" interpretation cannot be squared with:

    a.    The prosecution involving a potato silencer where the Government requested and received the "designed or intended" interpretation; or

    b.    Examiner Craze's testimony that towels, potatoes, and pop bottles can be silencers "depending on the circumstances."

At minimum, the Rule of Lenity should apply, since no court prior to this one has ever stated that the characteristics that make a device a firearm silencer is its "capability" or "capacity"

THE DEFENDANT

BY: /s/ Vincent A. Bongiorni
Vincent A. Bongiorni, Esq.
95 State Street - Suite #309
Springfield, MA 01103
(413) 732-0222
BBO #049040

CERTIFICATE OF SERVICE

I, Vincent A. Bongiorni, Esq., do hereby certify that I have served a copy of the foregoing via CM/ECF to the Assistant United States Attorney, Kevin O'Regan, United States District Court, 1550 Main Street, Springfield, MA. 01103 this 20th day of June 2006.

                    /s/ Vincent A. Bongiorni