UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

UNITED STATES OF AMERICA    )
                            )
                            )        ~ ~ Au~ ~7  ~ 9: 52
V.                          )        CR-04-30034-MAP
                            )        U.S. DISTRICT COURT
                            )        DISTRICT OF MASS.
MICHAEL ALAN CROOKER        )


DEFENDANT'S REQUEST FOR LEAVE TO LATE-FILE
A RENEWED MOTION FOR REQUIRED FINDING OF NOT GUILTY
PURSUANT TO F.R.CRIM.P. 29(c)
AND
RENEWED MOTION UNDER RULE 29(c)


On July 11, 2006 after the return of the verdict the
defense orally renewed its previously filed Motion for a
Required Finding of Not Guilty.  The court invited the defense
to file one in the proper fashion so that the government
could file a response.  Crooker then drafted such a motion
and asked his counsel to file it or something similar within
the time period of Rule 29(c).  Due to receiving an updated
copy of his Docket Entries and discovering that counsel had
failed to file the motion, Crooker asks that the court accept
the present motion filed pro se.  Previously this court has
accepted and considered this defendant's pro se filed papers,
including Docket Item 63 (Supplemental Memorandum and Proposed
Findings of Fact) and Item 82 (Proposed Jury Instructions on
"Silencer").

I.   THE INTERSTATE COMMERCE ELEMENT WAS NOT PROVED.

Crooker did not "cause" Exhibit 9 to travel interstate.

-2-

The undisputed facts from the suppression hearing and trial
are that Crooker <u>attempted</u> to mail Exhibit 9 in an Insured
Parcel Post package via Surface Mail from Feeding Hills, MA
to Celina, OH on June 7, 2004 but as soon as Crooker handed
over the package to Postmaster Price, it was intercepted and
set aside for Inspector Dailey, and was not inputted or scanned
into the mailstream.

The package was effectively seized on June 7, 2004. Seven
and a half days later on June 14, 2004 at 5:05 P.M. it was
opened pursuant to this court's search warrant and the contents
including Exhibit 9 were re-seized. Therafter on June 15, 2004
Inspector Dailey in Springfield sent it to Inspector Long in
Cleveland by way of a double-pouch Express Mail airmail
accomodation that the federal agents have to send things to one
another. Inspector Long picked it up at the airport on June 16,
2004 and a week later, on June 23, 2004 used it to make a
controlled delivery in Celina, OH in conjunction with an Ohio
judge's anticipatory search warrant.

## INSPECTOR DAILEY HAD SEVERAL CHOICES AND CROOKER CANNOT BE CHARGED TO HAVE "CAUSED" WHICHEVER OPTION THAT DAILEY CHOSE.

Inspector Dailey had at least three choices:

(1) Upon discovering Exhibit 9 on June 14, 2004 he could
have arrested Crooker for possessing an unregistered firearm-
silencer under 26 U.S.C. ß5861(d) and not sent it to Ohio.

-3-

(2)  He could have returned the parcel from whence it came and instructed Postmaster Price to input and scan it into the mailstream and allow it to move to Ohio via Surface Mail "under its own steam."  Thereafter it could be re-seized again in Ohio.

(3)  Or he could do what he did, that is, ship it interstate, on June 15-16, 2004, between the federal law enforcement offices of Springfield, MA and Cleveland, OH by use of the double-pouch, airmail, Express Mail accomodation.

The first option would have been legal.  The second would have at least been questionable if Crooker were to be blamed for the interstate movement (because he paid to have it shipped June 7, 2004, not June 15, 2004).  The third option was most definitely illegal if Crooker is to be blamed for the causation. Crooker cannot be the causation for whichever option federal law enforcement chose to do.  Federal law enforcement is simply not allowed to create their own interstate commerce jurisdiction to complete a federal offense.

## THE GUN CONTROL ACT'S INTERSTATE COMMERCE CLAUSE

The Gun Control Act uses a Commerce Clause, defined at 18 U.S.C. 921(a)(2), that is narrower than the general Interstate Commerce Clause at 18 U.S.C. 10.  Nowhere in Section 921(a)(2) does mailing something, or attempting to

−4−

mail or ship something, constitute interstate commerce.
Movement is required between two states, other than between two
points within the same state but through another state.   In
the present case an <u>attempted</u> shipment occurred and nothing
more.   The package never moved anywhere "under its own steam."

## INTERSTATE MOVEMENT OF CONTRABAND BY FEDERAL AGENTS

There is little or no case law on point where contraband
items are transported across state lines by federal law
enforcement agents with that movement said to be "caused" by a
defendant for jurisdictional purposes.

In response to the original Rule 29 motion made in this
case, the government provided the defense with the decision in
<u>United States</u> v. <u>Hinton</u>, 222 F.3d 664 (9th Cir. 2000) which
was the apparent impetus for their "causation" charging language
in this indictment.   While <u>Hinton</u> seems to resolve the
defendant's semantics issue regarding the language of "causing
to travel" being used in place of the statutory offense language
of "ship" or "transport," it does not help the government with
respect to the interstate commerce element.   Like the present
case, <u>Hinton</u> is alleged to have mailed a firearm interstate, from
Kansas to California, and was charged under 18 U.S.C. 922(g).

> By bringing his package to the post
> office and beginning the mailing
> process, Hinton definitely caused
> the package to be transported by the
> United States postal system.
> Consequently, Hinton shipped the
> package as that term is used in 922(g)(1) and (2).

But Hinton's package moved "under its own steam," under his
postage, under his selected class of mailing, on the day and
week that he selected.  There was no interference or complicity
by federal agents.  At the moment it crossed the Kansas state
line it was moving exactly as he had directed it to be,
therefore there can be no dispute that he caused it.

In the present case, the package never made it into the
original mailstream.  At the moment that it crossed the
Massachusetts state line it was moving under federal agent's
postage, in the federal agent's double-pouch Express Mail
airmail accomodation, at a time that they selected (which was
a week different from the week that Crooker paid to have it
shipped), and from and to cities different from the departure
and arrival cities slected by Crooker.

Hence there is no comparison between the present case
and Hinton.

## THE ISSUE OF INTENT

The argument was made that because Crooker intended to
ship Exhibit 9 from Feeding Hills, MA to Celina, OH on June 7,
2004, that it doesn't matter how, when or who wound up bringing
it to Ohio because it was his intent to send it there and that
"he got what he paid for."

Nowhere in the Gun Control Act's Interstate Commerce Clause
at 18 U.S.C. 921(a)(2) is intent or attempt enough to qualify

-6-

as constituting interstate commerce. Only consummated movements can qualify as interstate commerce.

Likewise nowhere in 18 U.S.C. 922(g) is intent or attempt enough to constitute a violation of the possession, receipt, shipment, or transport violations. Again, Section 922(g) only covers completed offenses.

And Crooker did not get what he paid for. He paid for Postal Insurance and he paid for Parcel Post Surface Mail postage in order to send the package on June 7, 2004 in a direct shipment from Feeding Hills, MA to Celina, OH. He did not get any of that. What he got was his property seized immediately, then re-seized 7 1/2 days later, then 8 days later shipped via Express Mail airmail in a federal law enforcement agency's double-pouch to a law enforcement agent in a wrong city (Cleveland), and finally, used as a prop in a Ohio investigation in Celina some 16 days later, on June 23, 2004, which is 12 days after the Postal Service's Website says that it should have been delivered via Surface Mail had it not been impeded.

For the foregoing reasons it has not been proven that Crooker shipped, transported, or caused Exhibit 9 to travel in interstate commerce.

## II.  THE SILENCER ELEMENT WAS NOT PROVED.

The device at issue, Exhibit 9, was found with an air rifle to which it mated threadwise. No firearms were found, the device had no gunshot residue, and it had never been shot through

by any firearm.  Government witnesses were not able to identify

any known firearm with barrel threading that matched the threads

on Exhibit 9.  To test Exhibit 9 with a firearm, ATF Examiner

Craze had to use a threaded adapter from an array of adapters

and a threaded replacement barrel to affix Exhibit 9 to a Ruger

pistol.

## FIREARM-SILENCER DEFINED

The statutory definition of a firearm-silencer is at

18 U.S.C. 921(a)(24):

> any device for silencing, muffling,
> or diminishing the report of a
> portable firearm, including any
> combination of parts, designed or
> redesigned, and intended for use
> in assembling or fabricating a
> firearm silencer or firearm muffler,
> and any part intended only for use
> in such assembly or fabrication.

The defense requested an instruction in the words of the statute

and also requested:

> If you find from the evidence that the
> device in question was for silencing
> an air rifle and was not for silencing
> a firearm, you must acquit the defendant.

Docket Item 161 -- Defendant's Request for Jury Instructions,

Nos. 3 and 5.  (Previous to this the defense had asked that the

term "device for silencing" be construed to mean "a device that

is designed or intended to be used with a portable, powder-burning firearm."  Docket Item 82 -- Proposed Jury Instructions on "Silencer").

The court denied all of the defense's jury instruction requests and rejected the defense argument that the term "device for silencing" means designed or intended.  The court chose to adopt the government's argument that the term "device for silencing" means anything "capable" of silencing and it hopelessly confounded and blurred the word "designed":

> For a device to be a firearm silencer, it must have been designed and fabricated in such a way that it is capable of silencing, or significantly reducing, the report of a portable firearm.
>
> It is sufficient if the government proves beyond a reasonable doubt that Exhibit Nine was designed and fabricated in such a way that it had the capacity to silence, or significantly reduce the report of a portable firearm, whether it was actually used to do so or not.
>
> Keep in mind, however, that the government need not prove Mr. Crooker or anyone else ever actually used Exhibit Nine as a firearm silencer or ever intended it to be used as a firearm silencer.

Jury Instructions at pages 15 and 16.

**THE COURT'S UNCERTAINTY WITH RESPECT TO THE WORD "FOR" IN THE TERM "DEVICE FOR SILENCING"**

At oral arguments held on November 7, 2005 regarding the

-9-

"designed or intended" versus "capable" debate, and again at the Charging Conference on July 7, 2006 the court itself stated that it was troubled by the ambiguity in the statutory silencer definition.

## CLASSIC CASE FOR THE RULE OF LENITY

There are at least five possible interpretations of the term "device for silencing."

(1)  Device **intended to be used** for silencing.  This would be any device that someone planned to use to silence a firearm.  It could be a metal cylinder or it could be a bed-pillow, towel, lawnmower muffler, motorcycle muffler, or a potato with a hole in it for insertion of the firearm barrel.

(2)  Device **designed to be used** for silencing.  This would be any device specifically manufactured or fabricated for the purpose of silencing a firearm.  It could be a metal cylinder but **could** **not** be a bed-pillow, towel, lawnmower muffler, motorcycle muffler or potato.

(3)  Device **that has been used** for silencing.  Any device that was actually used to silence a firearm.  It could be any of the items mentioned in (1) or (2) above.

(4)  Device **capable of being used** for silencing.  Any device capable of being used to silence a firearm without regard to intended use with a firearm or past use with a firearm.  Would necessarily include any and all bed-pillows,

lawnmower mufflers, motorcycle mufflers, towels, and potatoes regardless of intent or prior usage.

(5) Device **designed or intended to be used** for silencing. This could include any item in category (1) or (2) above depending upon the design of the manufacturer or the intended use by the accused.

Just the fact alone that there are five possible interpretations to choose from shows the need to invoke the Rule of Lenity and go with the defense's version (5) which is the only one that covers all devices and does not produce absurd results.

## THE MERRIAM-WEBSTER DICTIONARY, NEW EDITION

The word "for" has numerous possible meanings, one of which (Number 2) more appropriately and likely supports the designed or intended theory than do any that would support a capable theory:

- (1)   as a preparation toward (dress for dinner);
- (2)   toward the purpose or goal of (need time for study) (money for a trip);
- (3)   so as to reach or attain (run for cover);
- (4)   as being (took him for a fool);
- (5)   because of (cry for joy);
- (6)   used to indicate a recipient (a letter for you);
- (7)   in support of (fought for his country);

-11-

   (8)   directed at:  AFFECTING (a cure for what ails you);

   (9)   used with a noun or pronoun followed by an
         infinitive to form the equivalent of a noun
         clause (for you to go would be silly);

  (10)   in exchange as equal to: so as to return the value of
         (a lot of trouble for nothing)(pay $10 for a hat);

  (11)   concerning (a stickler for detail);

  (12)   CONSIDERING (tall for her age);

  (13)   through the period of (served for three years);

  (14)   in honor of (named for her grandmother).

Clearly the use of the word "for" in "device for silencing" means
the purpose or goal of as in Definition No. 2 above.  "Device
for silencing" has to mean a device whose purpose or goal is to
silence a portable firearm and purpose or goal logically infers
design or intent.  None of the definitions can reasonably turn
"for" into "capable of."

   This court has a history of allowing the ATF to distort
the ordinary meaning of English words and change their meaning
to "capable of" to suit their wishes.  It did so in Crooker v.
Magaw, Director of ATF, 41 F.Supp.2d 87, 89-90 (D. Mass. 1998)
when it ruled that ATF made a "plausible interpretation" in
holding that the term "designed for use" in the ammunition
regulation really meant "capable of being used."  But here there
is a huge difference.  The ammunition case was a civil matter
brought under the Administrative Procedures Act and this is a
criminal case, giving much less leeway in agency deference.  The
Rule of Lenity doesn't apply to civil cases.

## THE CAUSE OF THE AMBIGUITY

It must be remembered why there is an ambiguity problem in this case when there has not been in other silencer cases. No known case has ever arisen in the Federal Courts where someone was prosecuted for a firearm-silencer over a device that was not used or intended to be used with a firearm, and was designed for something other than a firearm.

In the typical firearm-silencer case there is a firearm involved and the accused is usually proven to have had a firearm-silencer that mated to, or was used with, that firearm.

This is the first federal case where an air rifle or paintballgun device has ever alleged to have constituted a firearm-silencer under 18 U.S.C. 921(a)(24).

It is for this reason that Section 921(a)(24)'s phrase, "device for silencing" can be so ambiguous. In every known case prior to this one there is no dispute that the device was designed, intended or actually used for silencing a firearm and that includes the infamous potato-silencer case in the District of Connecticut. United States v. Alpha McQuinn, infra.

There has never been a case where something designed as other than a firearm-silencer that wasn't so used or intended to be used for silencing a firearm was nevertheless prosecuted as a firearm-silencer based upon its capability alone.

## THE PROBLEM OF APPEARANCE

One of the undercurrents of this case is that Exhibit 9 is said to "look" like a firearm-silencer, that is, it <u>looks</u> like a typical Hollywood movie or television portrayal of what Hollywood thinks a silencer is supposed to look like. The prosecutor and the agents have argued or testified that it "looks" like what they feel that a silencer should look like.

But for one thing, Hollywood is often wrong. They frequently depict two-inch silencers which are an impossibility. They often show revolver-silencers, another impossibility since revolvers cannot be silenced.

Two, there are many things that "look" like a Hollywood silencer but in reality are something else. There are some motorcycle mufflers that are threaded on one end and look exactly like Exhibit 9. Also there are toy-gun silencers that look the same. All known detachable air rifle and paintballgun moderators look similar to a Hollywood silencer. There are also fake silencers made for specific firearms but which do not actually silence. For example, gun show vendors routinely sell fake MAC 10 and 11 style silencers that mate threadwise to those firearms but do not silence and are actually used as a foregrip, or handhold.

A second undercurrent in this case seems to be that because Exhibit 9 was designed for, and found with an air rifle, as opposed to being designed for and found with a motorcycle or lawnmower, this fact makes it more likely that Exhibit 9

-14-

could constitute a firearm-silencer because an air rifle could be
considered a "close cousin" to a firearm, whereas motorcycles
and lawnmowers cannot.  For example, a newspaper printed a
photograph of Exhibit 9 ("Courtesy of the U.S. Attorney's Office")
with a caption calling it a "gun silencer" though the body of
the article clearly stated that it was for an air rifle.  Hartford
Advocate, April 27, 2006.

     It is for this apparent reason that Crooker's argument
in Exhibit 40, the writing "<u>Federal Law Definition of a Silencer</u>"
where it is stated that an air rifle sound moderator is in the
same category as the lawnmower muffler since both are designed
and intended to quiet things other than firearms, is not taken
seriously, is downright ridiculed, and no attempt is made to
reconcile or distinguish them.

     This however is the legal arena and there is no room for
undercurrents.  We deal in hard facts and with statutes in
black and white.  The firearm definition at 18 U.S.C. 921(a)(3)
excludes air rifles just like it excludes lawnmowers.  It is
a cold hard fact that "silencers" are made for lawnmowers and
for air rifles and neither of those are firearms.  A "silencer"
for an air rifle is just as innocent as a "silencer" for a
motorcycle or a lawnmower.

     Likewise appearance is meaningless.  There are firearm-
silencers that are <u>not</u> cylindrical in shape at all., i.e. the
potato-silencer, <u>infra</u>., the towel-silencer that was accurately

-15-

depicted in the movie "The Godfather", and the bed-pillow silencer, frequently and accurately portrayed in movies.

Accordingly, this court is urged to ignore what it may "think" a silencer is supposed to look like or what the prosecutor or a federal agent may "think," and it should also ignore that an air rifle can be considered "similar" to a firearm. It may be similar in appearance but it is not similar in the law. We should be sticking to statute law, case law thereunder, and if the court is going to hold that an air rifle sound moderator is subject to firearm-silencer status due to capability alone, it must reconcile or distinguish the motorcycle and lawnmower mufflers which are just as "capable."

A device is either a firearm-silencer or it is not, depending upon design, intent, usage, capability, or some combination thereof. It is not a firearm-silencer because the defendant's name is Crooker or because it was part of an air rifle that could shoot through steel as opposed to a lawnmower, or because it "looks" like what one would expect a firearm-silencer to look like based on television or movie viewing experience.

## THE COURT'S PERCEIVED PROBLEM WITH INTENT, WITH WHOSE INTENT (TABLE LEGS AND PAPERWEIGHTS) AND REDUCTIO AD ABSURDAM

The court and the prosecutor have stated that "device for silencing" cannot be interpreted as requiring intent because a

defendant could claim that he intended to use a firearm-silencer only as a table leg or a paperweight.

The simple answer to this problem is to interpret "device for silencing" as requiring "design or intent."

A device could be designed as a firearm-silencer by the manufacturer but not intended to be used as a firearm-silencer by some other possessor. Conversly, a device could be designed as something other than a firearm-silencer by the manufacturer but nevertheless used or intended to be used by some possessor as a firearm-silencer, i.e., a bed-pilow or a lawnmower muffler.

In the first situation the device is always going to be a firearm-silencer regardless of what some other person intends to use it for. If it is manufactured as a firearm-silencer, it will always be one. A possessor using one as a table leg or a paperweight would have the same problem as someone using a live handgrenade as a paperweight -- knowledge. If he knew the grenade was a live grenade or that the silencer paperweight was designed to be a firearm-silencer then he would be guilty of possessing an unregistered firearm. On the other hand, if he thought that the grenade was harmlessly inert, or thought the silencer was only a toy, then he would not be guilty. This is the law of Staples, the Supreme Court's machinegun case requiring knowledge.

In the second situation, with respect to devices not designed by the manufacturer to be used as a firearm-silencer, such as a lawnmower muffler, motorcycle muffler, bed-pillow,

towel, or potato, those items could nevertheless become firearm-silencers depending on their actual use or intended use. As the testimony of ATF Examiner Richard Craze at the suppression hearing and trial demonstrates, these items can be silencers "depending on the circumstances," and in the case of the potato, is called a "spud-silencer."

With regard to "whose" intent that the court has stated "would bedevil any criminal proceeding," (Docket Item 87 Memorandum Decision dated February 23, 2006, page 7), the only logical and reasonable thing to do is to look at the design of the maker and the intention and knowledge of the accused and disregard the mental state of anyone else. What makes the device a firearm-silencer is the manufacturer's design or the accused's intent. If it was designed as a firearm-silencer then it still is and the issue is the accused's knowledge. If it wasn't designed as a firearm-silencer then it is the accused's intent that determines if it nevertheless becomes one.

The above is the only workable interpretation of the phrase "device for silencing" out of the five possible interpretations. None of the other four can possibly work.

In its Memorandum Decision, supra., at pages 7-8 the court states:

> a felon transporting a device that
> he knew would muffle the sound of a
> firearm might escape liability simply
> by pointing to the fact that the
> original designer, manufacturer,
> distributer, or seller of the device

> never intended it actually to be
> used with a firearm.  Congress could
> hardly have intended this result.

This would be true only if the device at issue were a real

firearm-silencer.  But if it were an innocent object such as a

pillow, a towel, a lawnmower muffler, motorcycle muffler, a

potato, or an air rifle or paintballgun moderator, Congress

could hardly have intended anyone to be federally prosecuted

on the mere technicality that such innocent device was

"capable" of muffling the sound of a firearm.  Capability as

the interpretation is not workable.

The court goes on at page 8 to ridicule the defense,

uses the Latin term reductio ad absurdam, and claims that

"no felon need be concerned about being prosecuted for

possessing a pillow or a bag of potatoes."  But defendant was

prosecuted for an innocent device, an airgun moderator, that

fits squarely within the "capable" category of devices not

used as, or designed or intended to be used with a firearm,

and further, right after the court's above decision ridiculing

the defense about potatoes, the defense did dig up a case from

the District of Connecticut where someone was prosecuted for

a potato as a silencer (though "intent" was used as the jury's

criteria and not "capability")  United States v. Alpha McQuinn,

3-99-CR-196-AVC.

Therefore while the court in stating that "the law

-19-

presumes a modicum of good sense" is apparently inferring that
the prosecutor can be trusted not to abuse his authority and
prosecute someone for an object that is innocent, history has
shown that the government cannot be trusted to sweepingly
interpret statutes their own way. Regardless of the law or the
government's "good sense", the fact remains that under a
"capable" interpretation of the phrase "device for silencing"
all of the folowing are firearm-silencers though not designed
or intended to be, simply due to the technicality that they
are "capable": potatoes, bed-pillows, motorcycle mufflers,
lawnmower mufflers, air rifle and paintballgun moderators, and
a host of other innocent objects. Under a "capable" interpretation
any possessor or transporter of these items can be prosecuted
at the whim of a federal agent even when no firearm is involved,
like there was not one involved in the present case. A person
could literally be prosecuted over a towel and the knowledge
element proven by video store business records that he rented
the movie "The Godfather" where the use of a towel-silencer is
portrayed by a young Corleone. For this reason the "for" in
"device for silencing" simply cannot mean "capable."

Accordingly, the silencer element was not proved for there
was no evidence that Exhibit 9 was used, intended for use, or
designed for use for anything other than the nonfirearm that
it was found with.

### III.  **THE KNOWLEDGE ELEMENT WAS NOT PROVED.**

There was not any evidence to prove that Crooker knew that
Exhibit 9, designed for and used with an air rifle, could also
work to silence a firearm and this is true as to either the
actual knowledge prong or the willful blindness prong.

**ACTUAL KNOWLEDGE**

As a matter of law and fact, generalized familiarity with
firearms, even gunsmithing, does not rise to the level of an
inference that such familiarity would extend to an oddball
and specialized device such as a firearm-silencer.

Even someone in the military, trained to disassemble and
reassemble firearms while blindfolded, isn't going to know a
thing about firearm-silencers, or about gunblueing steel, or
anodizing aluminum gun receivers, or why a flash suppressor works,
or a slew of other unusual firearm related matters.  Unless he
goes into Special Forces, he would not even encounter a
firearm-silencer.

Taking this even further, such person isn't going to know
if a silencer, made for an air rifle, is going to also work
on a firearm unless:

> (1)  He tries it out with a firearm
>      to test it;
>
> (2)  Someone else does;

-21-

    (3)   He has previously tried out
           a similar air rifle silencer
           with a firearm and found it to
           work;

    (4)   He learns of someone else
           doing so.

But here we have to go even further still for the court made a ruling on February 23, 2006 in its Memorandum Decision, Docket Item 87 that the knowledge has to pertain to <u>this particular</u> device, that is, Exhibit 9, and not just air silencers in general. There was not one shred of evidence that Crooker had actual knowledge that Exhibit 9 could also work on a firearm. It was conceded that Exhibit 9 had never been used on a firearm before. Even the federal agents who found it did not know if it could also work on a firearm until such time as they had Examiner Craze try it out.

Of the evidence presented regarding the generalized knowledge of firearms, of which there was a great deal, very little dealt with silencers and even that which did doesn't prove that there was actual knowledge that Exhibit 9 could also work on a firearm.

## EXHIBIT 14 - GUERILLA WARFARE WEAPONS BOOK

A picture on page 97 of a MAC 11 machinegun with attached silencer has no relevance to whether a specific air rifle silencer will also work on a firearm. There was no suggestion that the page 97 silencer had previously been an air rifle device.

-22-

## EXHIBIT 18 - LEGAL GUNS FOR PROHIBITED PERSONS

Of 52 pages only one paragraph mentions "silencer" and it is only a statement that Sam Yang air rifle silencers are being sold for $150 that reduce the report by 50%. Nothing at all is mentioned or suggested as to whether such an air rifle silencer could also work on a firearm.

## EXHIBIT 38 - EMAILS WITH CHIEF GLIDDEN

This is correspondence as to the statewise legality of air rifle silencers in general. While Chief Glidden opines that an air rifle silencer that could also be attached to and work with a firearm would be illegal under state law, there is nothing about whether Exhibit 9 could be so attached or work like that.

## EXHIBIT 48 - LETTER TO STEVEN CROOKER

Brief mention is made of air rifle silencer parts being sent in 1992 which were intercepted and not received. Nothing at all is said to support an inference that an air rifle silencer, much less the particular one known as Exhibit 9, would work on a firearm.

## EXHIBIT 40 - FEDERAL LAW DEFINITION OF A SILENCER

This would be the only piece of evidence where an inference arguably might be made that Crooker knew that an air rifle

silencer could be used with a firearm, but that would only relate
to airgun silencers in general, and not the particular one in
this case, Exhibit 9.  And even if this were about air silencers
in general and not about a particular one, it would not prove
actual knowledge, because Crooker, for the sake of legal
argument, conceded that an "airgun moderator could probably
be adapted for use as a silencer on a powderburner."  Such
generalized statements made in legal arguments does not equate
to actual knowledge about some particular device such as
Exhibit 9.

## WILLFUL BLINDNESS

To support willful blindness there has to be evidence to
support the inference that Crooker was aware of a high
probability that Exhibit 9 constituted a "firearm-silencer,"
that is, would work on a firearm to reduce its report, and
that he "purposely contrived" to avoid learning this "in
order to have a defense in the event of a subsequent
prosecution."  United States v. Bilis,  170 F.3d 88, 92
(1st Cir. 1999);  United States v. Brandon, 17 F.3d 409, 452
(1st Cir. 1994).

Crooker did not "purposely contrive" to avoid learning
anything because he did not believe he needed any defense.  The
evidence proves that Crooker thought that the law used "intent"
and not "capability" to define a firearm-silencer.  See Exhibit
40 - Federal Law Definition of a Silencer.  Since Crooker thought

-24-

it irrelevant whether Exhibit 9 could also function on a firearm and believed that design or intent were the relevant characteristics, he had no reason to contrive in order to have a defense.

But even if that were not the case, Crooker had no <u>legal</u> way to learn whether Exhibit 9 could also work on a firearm. He didn't possess any firearms with which to test it.  None were found at any of the search locales where he had access. Even if he did have access to a firearm, that would have been unlawful and in violation of Section 922(g).  Nor could he have mailed it to the ATF for them to test it.  That too would have violated Section 922(g) if it turned out to be capable of working on an ATF firearm.  Therefore Crooker had no possible way to legally learn whether Exhibit 9 would be classified as a silencer based upon a "capable" criteria.  Accordingly he could not contrive to avoid learning it.

Respectfully submitted,

*Michael Alan Crook*

Michael Alan Crooker, pro se
CCI MacDougall
1153 East Street South
Suffield, CT  06080

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I have this date mailed copies of the foregoing to Kevin O'Regan, AUSA, U.S. Attorneys, 1550 Main Street, Springfield, MA. 01103 and Vincent Bongiorni, Attorney, 95 State Street, ç309, Springfield, MA 01103.

Dated: *Aug. 11, 2006*          S/ *Michael Alan Crook*