**UNITED STATES SENTENCING COMMISSION**
ONE COLUMBUS CIRCLE, NE
SUITE 2-500, SOUTH LOBBY
WASHINGTON, DC 20002-8002
(202) 273-4500
FAX (202) 273-4529



# M E M O R A N D U M

**TO:**      Commissioners
Senior Staff
Phyllis Newton

**FROM:**   Rich Murphy, Coordinator
Firearms and Explosive Materials Working Group

**DATE:**   December 11, 1990

**SUBJECT:**   Firearms and Explosive Materials Working Group Report

Attached is the report of the Firearms and Explosive Materials Working Group.

OCT 1 3 2006

# TABLE OF CONTENTS[1]

Page

I.      INTRODUCTION AND GENERAL PRINCIPLES ...................... 1

II.     SUMMARY OF FIREARMS STATUTES ........................... 2

III.    BACKGROUND DATA ON FIREARMS AND EXPLOSIVES ............. 6

IV.     REVIEW OF APPELLATE CASES ............................... 7

V.      HISTORICAL SENTENCING PATTERNS ......................... 7

VI.     REVIEW OF MONITORING DATA AND CASE FILES ............... 7

VII.    DISCUSSION OF PROPOSED FIREARMS GUIDELINE

        2K2.1(a)(1) .......................................... 10

        2K2.1(a)(2) and (3) .................................. 17

        2K2.1(a)(4) .......................................... 28

        2K2.1(a)(5)(A) ....................................... 32

        2K2.1(a)(5)(B) ....................................... 34

        2K2.1(a)(5)(C) ....................................... 35

        2K2.1(a)(5)(D) ....................................... 37

        2K2.1(a)(6) .......................................... 38

        2K2.1(b)(1) .......................................... 42

        2K2.1(b)(2) .......................................... 45

        2K2.1(b)(3) .......................................... 48

---

[1] This table of contents has been revised to reflect the addition to the December 11, 1990, report of supplemental appendices prepared in April 1991. Appendices to the original report are found in Volume I; appendices to the supplemental report are found in Volume II.

2K2.1(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

2K2.1(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

2K2.1(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

2K2.1(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

2K2.1(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

2K2.1(b)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

2K2.1(b)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2K2.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## VII.  DISCUSSION OF EXPLOSIVE MATERIALS GUIDELINE

2K1.1(a)(1) and (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

2K1.1(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

2K1.1(a)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

2K1.1(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

2K1.1(a)(4)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

2K1.1(a)(4)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

2K1.1(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

2K1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

2K1.1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

2K1.1(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

2K1.1(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

2K1.1(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

2K1.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

## I.    INTRODUCTION AND GENERAL PRINCIPLES

The Commission has requested that the Firearms and Explosives Working Group thoroughly examine the firearms guidelines (§§2K2.1 - 2K2.5) and explosives guidelines (§§2K1.1 - 2K1.7), and make appropriate revisions.  This report analyzes the working group's two proposed guidelines.

Firearms and explosives legislation is notoriously burdened with the complexity and confusion bred by political compromise.  As a consequence, the fashioning of a comprehensive, yet workable, guideline is handicapped from the start.

In an effort to be as informed as possible, the working group reviewed firearms and explosives monitoring data, case files, and appellate decisions, and received comments from the field and from the Bureau of Alcohol, Tobacco, and Firearms (ATF).[1]  Based on this input, the working group has drafted initial proposed firearms and explosives guidelines that would combine four of the firearms guidelines, §§2K2.1, 2K2.2, 2K2.3, and 2K2.5, into a single firearms guideline for publication at U.S.S.G. §2K2.1; and would combine four explosives guidelines, §§2K1.1, 2K1.2, 2K1.3, and 2K1.6, into a single explosives guideline for publication at U.S.S.G. §2K1.1.

---

[1] Comments and critiques from the field calling for changes to the firearms guidelines are numerous (e.g., letter to Commission from federal district judge who states that the § 2K2 guidelines are "manifestly low in relation to other offenses ... increase significantly"), and are referred to briefly throughout the report.

The working group intends this consolidation of guidelines into a single guideline to achieve the following objectives:

(1)  eliminate duplication and confusion in the application of the current guidelines, particularly with respect to multiple cross references, and the apparent application of more than one guideline to the same statute;

(2)  reflect the concerns and sentencing practice discerned from monitoring data, appellate decisions, and hotline logs; and

(3)  reduce the number of departures and consequent disparity by relying more heavily on specific offense characteristics.

## II.  SUMMARY OF FIREARMS STATUTES

Until the 1920's and early 1930's, firearms restrictions were largely the province of State and local authorities.  However, criminals, particularly those in organized crime, increasingly used more dangerous firearms such as machineguns, automatic weapons, guns equipped with silencers, and sawed-off firearms.[2]  Local governments were perceived as unable to stem the national use of these dangerous firearms, and pressure soon developed to enact federal firearms restrictions.

---

[2] These firearms are known as National Firearms Act (N.F.A.) firearms.  They can be distinguished from less destructive and volatile firearms, such as handguns, unaltered, regulation-length longarms (rifles and shotguns), and various semi-automatic weapons. Destructive devices, such as pipebombs and grenades were later added to the list of N.F.A. firearms.

In 1934, the National Firearms Act (N.F.A.), 26 U.S.C. § 5801, et seq., was enacted. The Act restricts the use of various serious firearms (N.F.A. firearms) by requiring manufacturers, importers and dealers to register annually with the federal government, to pay occupational, manufacture, and transfer taxes, to identify firearms with serial numbers or other methods of identification, and to maintain such records and returns as prescribed by the Secretary.[3] All "makings"[4] and transfers are required to be approved by the Secretary.[5] Every firearm is to be registered, and the information compiled in a central registry maintained by the Secretary.[6] The importing of N.F.A. firearms, except for certain lawful purposes (research, government use, etc.), is prohibited.[7] The receipt or possession of any unlawfully transferred, manufactured, transported, or imported firearm, or the possession of any unregistered or unidentified firearm, is punishable by a term of imprisonment not to exceed ten years.[8]

---

[3] 26 U.S.C. §§ 5801, 5802, 5811, 5821, 5842, 5843.

[4] Under the Act, "making" a firearm involved the manufacture of a weapon by one not qualified to engage in the business of manufacturing firearms; "manufacturing" involved the manufacture by one engaged in the business. See 26 U.S.C. § 5845(i).

[5] 26 U.S.C. §§ 5812, 5822.

[6] 26 U.S.C. § 5841.

[7] 26 U.S.C. § 5844.

[8] 26 U.S.C. § 5871.

3

Additional federal firearms legislation was enacted in 1968, as part of the Gun Control Act of 1968, 18 U.S.C. § 921, et seq.[9] This Act extends considerable additional restrictions over N.F.A. firearms, and introduces some of the first federal firearms restrictions to non-N.F.A. firearms, such as shotguns, rifles, handguns, and other semi-automatic and manual firearms, and ammunition.

The Gun Control Act requires all importers, manufacturers, and dealers, including pawn brokers, to procure a license from the federal government before engaging in the business of importing, manufacturing, dealing, shipping, transporting, receiving firearms or ammunition.[10] Dealers are restricted from selling or delivering to underage persons or non-State residents, from violating State law, and from selling N.F.A. firearms or armor-piercing ammunition.[11] The manufacture and domestic sale of certain types of ammunition, particularly armor-piercing ammunition, is prohibited.[12]

Unlicensed persons are prohibited from delivering, or selling firearms in many cases.[13]  Any person acquiring a firearm is

---

[9] The Act underwent a subsequent, substantial revision in 1986 as part of the Firearms Owners' Protection Act (FOPA).

[10] 18 U.S.C. § 922(a)(1).

[11] 18 U.S.C. § 922(b).

[12] 18 U.S.C. § 922(a)(7), (a)(8).

[13] 18 U.S.C. § 922(a)(3)-(5).

4

required to provide certain information to the dealer.[14] No person can transport stolen firearms, firearms not properly identified with serial numbers, or, in most cases, machineguns.[15] The possession of firearms and other weapons in federal facilities or school zones is generally prohibited.[16] Certain unauthorized persons (felons, fugitives, illegal aliens, indicted persons, drug users, incompetents, and dishonorably discharged military personnel) are prohibited from possessing or dealing in weapons.[17] Most of the offenses under the Act are subject to five-year statutory maximums,[18] but certain relatively serious offenses might receive ten-year terms of imprisonment.[19]

Two predominant threads underlie the approach and penalty structure of the firearms statutes. First, law-abiding citizens generally have the right to own firearms, and this ownership should be subject to minimal federal regulation. Amendments to the Gun Control Act, made under the Firearms Owner Protection Act,

---

[14] 18 U.S.C. § 922(a)(6).

[15] 18 U.S.C. § 922(i)-(k).

[16] 18 U.S.C. §§ 922(q), 930.

[17] 18 U.S.C. § 922(g).

[18] But cf., 18 U.S.C. § 922(m) (one year statutory maximum where dealer makes false entries or records, or fails to make required records).

[19] See e.g., 18 U.S.C. § 922(g) (prohibiting felons, and others, from possessing firearms); 18 U.S.C. § 922(h) (prohibiting employees of felons, and others, from purchasing firearms in the course of their employment); 18 U.S.C. § 922(i) (prohibiting shipping of stolen firearms); 18 U.S.C. § 922(j) (prohibiting receipt or sale of stolen firearms); 18 U.S.C. § 922(o) (prohibiting transfer or possession of machinegun).

underscore this theme.[20]  A second consideration is the intent of Congress that the statutes and their penalty provisions provide for harsh punishment where the offender is not a law-abiding citizen,[21] or where particularly serious weapons are involved, such as those regulated by the National Firearms Act.[22]

Numerous additional proposals for restricting certain handguns and military-style, semi-automatic assault rifles have been proposed since the early 1970's, but none have passed into law.[23]

## III.  BACKGROUND DATA ON FIREARMS AND EXPLOSIVES

Firearms have had considerable negative impact on society when put to unlawful uses.  Vital Statistics data show that in 1987 handguns were used in almost 3,300 suicides, and other firearms or

---

[20]  See Hardy, The Firearms Owners' Protection Act:  A Historical and Legal Perspective, 17 Cumberland L. Rev. 585-682 (1987) for a detailed summary of the Act and the negotiations on which the Act was predicated.  See also discussion in Research Project, Federal Firearms Legislation, 6 Hamline Law Review 409, 412-415.  The author cites as the predominant provisions furthering this philosophy the restrictive definition of "engaged in the business of selling firearms," the tightened scienter requirements, and liberalized record keeping requirements for dealers.

[21] See 18 U.S.C. § 924(a)(2), providing for ten year statutory maximums for offenses involving prohibited persons under 18 U.S.C. § 922(d), (g) and (h), and providing for a lower standard of scienter ("knowing") in contrast with the higher "willing" standard provided for violations of other provisions under the statute.

[22]  See 18 U.S.C. § 924(a)(2) which provides a ten year statutory maximum for "knowing" as opposed to "willing" violations of 18 U.S.C. § 922(o); see also 26 U.S.C. § 5871 (penalties for violations of the National Firearms Act).

[23]  See summary of legislation pending in the 101st Congress, printed in Hogan, Gun Control, Congressional Research Service Issue Brief (September 4, 1990).

6

unspecified firearms used in an additional 14,800 suicides -- well over half of all such deaths. Firearms were similarly used in over half of the homicide deaths in 1987, with at least 1,000 involving a handgun, and 11,600 involving other or unspecified firearms.[24]

The FBI reports through its Uniform Crime Reporting Program (UCR) that almost 12,000 of the nearly 19,000 1989 murders were accomplished with a firearm, usually a handgun, but frequently a long gun. The FBI also reports that firearms were used in over a third of all robberies, and a fifth of all aggravated assaults.[25]

## IV.    REVIEW OF APPELLATE CASES

See Appendix F for a review of decisional law concerning application of the firearms guidelines.

## V.    PAST PRACTICE -- HISTORICAL SENTENCING PATTERNS

Historical sentencing patterns for 18 U.S.C. § 922 have varied considerably. Section 922 cases not sentenced under the guidelines have received average sentences ranging from 32 months to 62 months, with an approximate average annual total of 42 months. Sentencing patterns for 26 U.S.C. § 5861 were considerably higher, with the average sentence over a period of July 1982 to June 1986 reaching 61 months.

---

[24] Vital Statistics of the United States, 1987, Volume II-Mortality, Part A, Division of Vital Statistics of the National Center for Health Statistics.

[25] Crime in the United States:    1989, U.S. Department of Justice, Federal Bureau of Investigation.

## VI.  REVIEW OF MONITORING DATA AND CASE FILES

Monitoring's 1989 data file, Mon1289, shows that 945 firearms cases averaged sentences of 43 months.[26]  This Monitoring data shows 1,153 firearms cases, 6.0% of all cases.[27]  The 1990 data file, Mon690, shows similar numbers of cases, with 1,351 firearms cases (5.7% of all cases), and 71 explosive materials cases (.3% of all cases).

The 1989 data file also shows upward departures occurred in 8.4% of the cases (compared with an overall guideline average of 3.5%), and downward departures occurred in 6.0% (compared with an overall guideline figure of 8.9%).[28]

The race of defendants was 56% white, 31% black, and 11% Hispanic, compared with an overall guideline figure of 47% white, 28% black, and 25% hispanic.  The gender of defendants was 97% male, 3% female, compared with an overall guideline figure of 84% male and 15% female.  Two-thirds of defendants received level 10 or less (compared with overall guideline figures of 40%).

The working group undertook extensive review of case files in order to ascertain the aspects of the firearms and explosives guidelines that worked well, and to determine the issues that appeared to raise the greatest concerns in the field.  The working

---

[26] Annual Report 1989, U.S. Sentencing Commission (Table VI).

[27] Id. Appendix B, Table B-4.

[28] Id., Table XII.  See Appendices D, G, I, K. L, M, N, O, and P

8

group reviewed and summarized all case files in which the court applied the current version of the firearms and explosives guidelines.[29] In reviewing this set of files, the working group sought to identify issues arising from the current firearms and explosives guidelines that might need to be addressed in the current amendment cycle.

In addition, the working group separately reviewed and summarized case files in which the court applied the 1987/1988 version of the guidelines.[30] The working group reviewed these cases primarily to determine issues that endured throughout the application of the guidelines, regardless of the version of guidelines applied.[31]

The working group has carefully relied on these case files to justify various aspects of the proposed guideline. For example, the review of case files alerted the working group to offense characteristics that correlated with higher average sentences or

---

[29] Twenty-two cases applied §2K1.3 (1987); seven applied §2K1.6 (1987); sixty-four applied §2K2.1 (1989); seventeen applied §2K2.2 (1989); three applied §2K2.3 (1989); and fifteen applied §2K2.5 (1989).

[30] The working group reviewed thirty-four cases which applied §2K2.2 (1987); and seventeen cases which applied §2K2.3 (1987). No 1987 version of §2K2.5 existed, so no cases could be reviewed. The large number of §2K2.1 (1987) cases (up to 1500) has prevented the working group from conducting any meaningful and complete review of §2K2.1 (1987) cases at this point.

[31] Case file summaries are attached in the appendix to this report (Appendices D, G, and H), as are in depth reviews of the findings (Appendices E, I, K and L). In addition, sets of tables summarize the findings for §2K2.1 (1989) (see Appendix D, Tables I-A through I-D), and for §2K2.2 (1989) (see Appendix G, Tables I-A through I-B).

9

sentences at the upper end of the guideline range, including actual or intended unlawful or criminal use of the firearm,[32] possession of the firearm for personal protection, sporting or collection purposes,[33] drug-related conduct,[34] N.F.A. firearms,[35] destructive devices.[36]

The review also shows that 33% of all §2K2.1(a)(1) (1989) cases (applying to the most serious offenses) were sentenced at or above the upper end of the guideline range, and that 34% of §2K2.1(a)(2) (1989) cases (typically felon in possession) were so sentenced.[37] This suggests a general insufficiency of these guidelines -- in contrast with the sentencing practices for §2K2.1(a)(3) (1989) (typically less serious possession and record

---

[32] Of §2K2.1 (1989) cases with this factor, 39% appeared at or above the guideline range; the average sentence was seventeen months, compared with an average sentence of fifteen months for all §2K2.1 (1989) cases.

[33] 72% of §2K2.1 (1989) cases with this factor were sentenced at or below the lower end of the guideline range; the average sentence was 11 months.

[34] 44% of §2K2.1 (1989) cases with this factor were sentenced at or above the upper end of the range; the average sentence was eighteen months.

[35] 35% of the §2K2.1 (1989) cases with this factor were sentenced at or above the upper end of the guideline range; the average sentence was nineteen months.

[36] All §2K2.1 (1989) cases with this factor were sentenced at or above the upper end of the guideline range; the average sentence was thirty months.

[37] A rough estimate of the number of all guidelines cases sentenced to the upper end of the guideline range is 15-20%, including upward departures.

10

keeping offenses) where only 11% were sentenced at the upper end of the range.

## VII.  DISCUSSION OF PROPOSED FIREARMS GUIDELINE

### PART I.  BASE OFFENSE LEVELS

1.  Proposed Section 2K2.1(a)(1):

> (1)  [18-20], if the offense conduct involved one or more firearms defined in 26 U.S.C. § 5845(a); [but if the offense conduct involved one or more destructive devices, as defined in 26 U.S.C. § 5845(f), then level [20-22]]

*Present Guideline*

§2K2.1(a)(1) provides a base offense level of 18 for unlawful receipt, possession, or transportation of National Firearms Act (N.F.A.) firearms (firearms defined in 26 U.S.C. § 5845(a)). §2K2.2(a)(1) applies to unlawful trafficking of N.F.A. firearms. Application of the present guideline requires a conviction under 26 U.S.C. § 5861.

*Proposed Guideline*

Proposes level 18-20 if the offense conduct involved one or more National Firearms Act (N.F.A.) firearms defined in 26 U.S.C. § 5845(a), whether or not the statute of conviction was 26 U.S.C. § 5861. Proposes a bracketed option that where the offense conduct involved "destructive devices," defined in 26 U.S.C. § 5845(f), the conduct receives level 20-22. Application Note 1 defines the term "firearms" by referencing 18 U.S.C. § 921(a)(3)-(8). An application note defines the term "defined in 26 U.S.C. § 5845(a)" by referencing that statute.

*Statutory Provisions*

26 U.S.C. § 5861(a)-(1) (prohibiting various conduct, including failure to properly register or secure a license, and possession of unregistered firearms, and firearms without serial numbers). Statutory maximum is ten years.

18 U.S.C. § 922(a)(4) (prohibits any unlicensed person from transporting any N.F.A. firearm). Statutory maximum is five years.

18 U.S.C. § 922(b)(4) (prohibits any dealer from selling or delivering N.F.A. firearm). Statutory maximum is five years.

18 U.S.C. § 922(o) (prohibition on any person transferring or possessing a machinegun). Statutory maximum is ten years.

*Issues*

a.  Should the current offense level (18) for conduct involving National Firearms Act firearms be raised to a level 19 or 20?

b.  Should the offense level for conduct involving destructive devices be raised from the same level as conduct involving other National Firearms Act firearms (a level 18) to a separate, higher level (20-22)?

*Discussion*

Offense conduct involving National Firearms Act (N.F.A.) firearms (including machineguns, destructive devices, such as pipebombs and grenades, silencers, and sawed off or short-barrel rifles and shotguns)[38] is generally considered more serious because such weapons are viewed as more dangerous than other firearms.[39] In recognition of this fact, Congress imposed relatively high statutory maximums where such firearms are involved. See 26 U.S.C. § 5871. ATF has recommended a base offense level of 20 for these offenses.[40]

---

[38] Firearms not considered "N.F.A. firearms" include regulation or legal length long guns (rifles and shotguns), handguns, starter guns, and the frame or receiver of any such weapon. See 18 U.S.C. § 922(a)(3) and 26 U.S.C. § 5845(a).

[39] Certain Members of Congress and advocacy groups have proposed in the last two decades that offenses involving additional firearms, such as handguns and assault rifles, be considered deserving additional regulation and penalties. The working group has not chosen to separate these firearms for special treatment under the guidelines in light of the failure of Congress to separate these firearms for special regulatory or punitive treatment. Further, ATF notes that military-style assault weapons can not be distinguished from other semi-automatic firearms, and so should not be treated differently. Meeting with ATF officials, October 12, 1990.

[40] See Appendix C, ATF letter to the Commission (December 14, 1989). See Attachment for text of this letter.

13

Past sentencing practice confirms the heightened concern with these weapons. Monitoring data for guidelines cases applying the 1989 version of §2K2.1 reveals that courts impose sentences in cases involving N.F.A. firearms at the upper end of the range more frequently than the norm for all non-firearms guidelines (35% of cases sentenced at upper end or above the range, compared with a norm of approximately 15%)[41]. Monitoring data also reveal that courts in these cases impose higher average sentences when N.F.A. firearms are involved (average 19 months compared with a norm in §2K2.1 cases of 15 months).

The proposed guideline would apply not only to charged conduct, as is the case with the present guideline, but to the offense conduct, itself. The intended result is that the felon, or other offender, in possession of an N.F.A. firearm should receive a base offense level that adequately reflects the danger of these firearms, notwithstanding the particular count of conviction, thereby eliminating or restricting plea bargaining designed to circumvent the guidelines. (Note: three of fifteen §2K2.1 (1989) cases involved offenders who unlawfully possessed an N.F.A. firearm, but were not charged under the N.F.A. statute).

The working group also proposes for the Commission's consideration and for public comment the making of a distinction between destructive devices and other N.F.A. firearms, on the ground that destructive devices are inherently more volatile and

---

[41] Monitoring data provided throughout this report has been culled from a review of cases applying 1987 and 1989 firearms guidelines.

14

more prone to unlawful uses than other N.F.A. firearms that can be better controlled and arguably have more limited ability to damage.[42]  Past sentencing data is sparse:  the two §2K2.1 (1989) cases involving destructive devices received average sentences of 30 months (compared with an overall §2K2.1 average of 15 months, and an N.F.A. firearms average of 19 months), and both were sentenced at the top or above the guideline range.  But the single §2K2.2 (1989) case was a downward departure for substantial assistance to a four-month sentence.  Of four §2K2.2 (1987) cases, the average sentence was also nineteen months.

*Possible Concerns* [43]

    1.   <u>Making  N.F.A.  Violations  Subject  to  A  Real  Offense</u>
<u>Approach</u>

---

[42] The case files are replete with egregious examples of the unlawful use to which destructive devices are put.  [Note: Case file numbers are available.]  Bomb intended to be used as diversion during bank robbery; defendant threw pipebomb at his wife's car, and later threw molotov cocktail through the window of her house, after beating the wife and kidnapping their child; defendant sold grenades for cocaine and crack; defendant gave pipebomb to codefendant who exploded the bomb in the faces of police officers; defendant built pipebombs and hired friends to use the devices against his enemies who owed him money; similar conduct; defendant placed pipebomb under co-worker's car--it exploded, killing one child; defendant arrested before he was able to use two pipebombs on certain public officials. <u>U.S. v. Foster</u>, 898 F.2d 25 (4th Cir. 1990) (jilted defendant placed bomb in new boyfriend's car, but it failed to explode).

[43] The "Possible Concerns" sections throughout this report note concerns not necessarily raised in the "Discussion" sections.  An occasional absence of a "Possible Concerns" section at a particular point in the report may occur as a result of considerations of brevity and space, or where the "Discussion" section referred to relevant concerns.

The present guidelines provide for an enhanced level for N.F.A. violations only when convictions occur pursuant to statutory provisions that specifically address such firearms. Thus, if a defendant in possession of an N.F.A. weapon, such as a machine gun, a silencer, or a sawed off shotgun is convicted under one of the "N.F.A. statutes" that specifically prohibit possession of such weapons, he presently receives an offense level of 18. If, however, his offense conduct is the same, but he instead is convicted under a different statute not directly addressing N.F.A. weapons, he presently receives an offense level of 6 or 12, depending on the statute used.

Such a system poses an obvious potential for sentencing disparity. Such disparity might be justified if N.F.A. prosecutions included both serious and minor record-keeping violations, such that the exercise of prosecutorial discretion to distinguish between the two would be appropriate. ATF informs us, however, that with regard to possession of N.F.A. firearms--to wit, machineguns, silencers, sawed off shotguns, and destructive devices, such as pipebombs -- there are virtually no minor violations.

2.   Raising the Offense Level for N.F.A. Weapons and Carving Out An Additional Enhancement for Destructive Devices

The working group has recommended for the Commission's consideration bracketed language setting N.F.A. offenses at an offense level of 18-20. The present level is 18; 20 would represent a two level increase.

There has obviously been little experience with N.F.A. offenses since the 1990 amendment raising such offense from a level 16 to a level 18. If the Commission examined this guideline by itself, that absence of experience might disfavor changing the guideline one year later. Because the Commission is considering a reworking of the entire firearm guideline scheme, however, it makes sense for the Commission to decide, with some finality, what it believes to be the appropriate offense level for N.F.A. offenses. Given the consistent dissatisfaction with the firearms guidelines, as reflected by the frequency with which these guidelines have been amended, the working group feels that it is important that the appropriate levels be settled in one amendment process in order to avoid the need to revisit the area in future amendment cycles.

Accordingly, the Group has proposed for the Commission's consideration an amendment that would raise by two levels the offense level for N.F.A. violators. The justification for the increase, if the Commission chooses to make such an increase is that in the past, the Commission, through its guidelines, has indicated its belief that N.F.A. violations are among the most serious firearms offenses. If the Commission decides to raise the offense levels for other firearms' violations, as suggested _infra_ by the working group, it also may wish to increase the N.F.A. offense levels to retain the proportionally higher levels traditionally given to those offenses.

Second, the Group has offered for the Commission's consideration the question whether destructive devices, which are

**17**

included as N.F.A. firearms, should themselves receive an enhanced
offense level over other N.F.A. weapons. The statute's failure to
distinguish such devices from other N.F.A. weapons arguably
disfavor a distinction made by the guidelines. Favoring an
enhancement, however, is the inherent dangerousness, the
unlikelihood of any legitimate use, and the risk posed to greater
numbers of people by devices such as pipebombs or hand grenades.
Alternatively, the possession of a destructive device could be the
basis for an upward departure. The Commission may wish to seek
public comment on this question.

2.    Proposed Sections 2K2.1(a)(2) and (3):

      (2)    [24], if the defendant is a prohibited person and
            had at least two prior [convictions for a violent
            felony or serious drug offense] [felony
            convictions for a crime of violence or controlled
            substance offense] [, or firearms offense]; but if
            the offense conduct involved one or more firearms
            defined in 26 U.S.C. § 5845(a), then level [26];

      (3)    [20], if the defendant is a prohibited person and
            had one prior [conviction for a violent felony or
            serious drug offense] [felony conviction for a
            crime of violence or controlled substance offense]
            [, or firearms offense]; but if the offense conduct
            involved one or more firearms defined in 26 U.S.C.
            § 5845(a), then level [22]

*Present Guideline*

§2K2.1(a)(2) provides a base offense level 12 for a prohibited
person, regardless of the number or nature of prior convictions.

*Proposed Guideline*

Proposes level 24 if the defendant is a prohibited person and had
two prior felony convictions for a crime of violence, controlled
substance offense, or, optionally, a firearms offense.

18